Vasilios HARALAMPOPOULOS, by his guardian John HARALAMPOPOULOS, Plaintiff–Appellant,

v.

Jason L. KELLY, M.D., and Mauricio L. Waintrub, M.D., Defendant–Appellees.

No. 10CA0668.

Colorado Court of Appeals, Div. III.

Oct. 13, 2011.

Rehearing Denied Nov. 10, 2011.*

* Webb, J., would grant.

John Haralampopoulos, appeals the judgment entered on a jury verdict in favor of defendants, Jason L. Kelly, M.D., and Mauricio L. Waintrub, M.D., and the order awarding certain costs to defendants. We reverse the judgment and order and remand for a new trial.

## I. Background

Plaintiff went to an emergency room with abdominal pain of unknown origin on November 23, 2004. Tests disclosed a cyst on his liver. The surgeon on call ordered a needle biopsy of the cyst for the following day. Waintrub, the internist on call, took plaintiff's medical history and admitted him for this procedure, but did not ascertain the cause of the cyst.

The following day, on November 24, 2004, Kelly performed the needle biopsy. Shortly after the cyst was pierced, plaintiff suffered a severe allergic reaction, became hypoxic, and stopped breathing. Before plaintiff could be revived, he suffered permanent brain injury.

According to guardian, had the cause of the cyst been determined, a risk would have been recognized that spillage of the cyst's contents during a needle biopsy would lead to anaphylactic shock. Guardian alleged that Waintrub was negligent in not ordering tests to determine the cause of the cyst or consulting a specialist before admitting plaintiff for the needle biopsy. Guardian alleged that Kelly was negligent in failing to consider the cause of the cyst and performing the biopsy without taking appropriate precautions against an allergic reaction.

## II. Evidence of Cocaine Use

Guardian first contends the judgment should be reversed because the trial court erroneously admitted evidence of plaintiff's alleged cocaine use. We agree.

The introduction of hearsay testimony about remote drug use threatened to, and in our view did, derail the trial proceedings. The cocaine use issue—as dated and unreliable as the evidence was—was the centerpiece of Waintrub's and Kelly's defense. Rebutting that cocaine use was the reason for

Holland & Hart LLP, Teresa D. Locke, Keeya M. Jeffrey, Denver, Colorado, for Plaintiff–Appellant.

Cooper & Clough PC, Kay J. Rice, Beth N. Nesis, Denver, Colorado, for Defendant–Appellee Jason L. Kelly, M.D.

Jaudon & Avery, LLP, David H. Yun, Jared R. Ellis, Denver, Colorado, for Defendant–Appellee Mauricio L. Waintrub, M.D.

Opinion by Judge FOX.

In this medical malpractice action, plaintiff, Vasilios Haralampopoulos, by his guardian,

plaintiff's vegetative state became guardian's focus at trial.

### A. Procedural History

#### 1. Pretrial Motions and Rulings

Before the first trial,[1] guardian moved in limine to exclude the following hearsay statements, made during depositions, regarding plaintiff's alleged cocaine use:

- Guardian: During the 1990s, plaintiff's acquaintances told guardian that plaintiff was using cocaine. Although guardian had never seen plaintiff do so, he expressed his concern to plaintiff.

- Georgia Vlassis, one of plaintiff's sisters: At a December 3, 2004, meeting with other family members and attorney Patricia Dean after plaintiff suffered the adverse reaction, plaintiff's former girlfriend, Lori Hurd, said that "many years ago" plaintiff had used cocaine.

- [Kelly]:

 A: [A]bout two weeks after the event [of plaintiff's injury and after the December 3 meeting with the family] ... [Hurd] asked me if cocaine could have had anything to do with what happened to [plaintiff]. And I said, Yes, I don't specifically know what happened to [him], but cocaine was probably a factor if he used it. And so I asked her if he did use it.

 Q: What did she tell you?[2]

 A: She told me that he was a recreational cocaine user and that that had been an issue in their relationship, and that in the days around his first emergency room visit, he had been using a significant amount of cocaine because of the pain; and he didn't feel that the physicians at the hospital after his first visit had given him enough pain medicine.

Defendants responded to the in limine motion, stating that the statements fit the medical diagnosis exception, CRE 803(4), and the residual exception, CRE 807. In an oral ruling, the trial court denied guardian's motion, explaining:

> It seems to me that the probative value of those statements is imperative to the defense presentation of the case, but all of the issues brought up by plaintiff in the motion, in my view, are suitable for cross-examination and also for ultimate argument. But to—I think it is under the hearsay exception for purposes of medical diagnosis. Doctors every day rely on statements made to them not just by the patient, but also family members, in making treatment decisions.

> Furthermore, under the residual hearsay, I find that it's also appropriate under that hearsay exception. Under 403, it is intensely probative in the case, and while it is also intensely prejudicial to the plaintiff[ ] in this case, on balance I think that it is appropriate to permit that information in. [sic]

After a mistrial, the case was assigned to a second judge who rotated into the division. Guardian again moved in limine to exclude the hearsay statements because of two changed circumstances: defense counsel's later admission that "at the time [Hurd's] statements were made [to Kelly], Defendant Kelly was no longer treating Plaintiff,"[3] and an affidavit from Hurd, who had not been deposed before the trial court's in limine ruling, denying the statements Kelly attributed to her. The court struck guardian's

---

**1.** This trial ended in a mistrial related to an insufficient number of remaining jurors after several were excused.

**2.** Hurd later denied Kelly's account, but admitted to telling Kelly that plaintiff used cocaine in the 1990s. The first judge was not aware of the new information. The subsequent judges were made aware of it, but failed to reconsider the earlier ruling.

**3.** The dissent takes the position that guardian failed to make the argument to the trial court

that Kelly was no longer treating plaintiff. In doing so, the dissent effectively ignores the second motion in limine presented to the second judge and the trial brief presented to the third judge. While the first judge initiated the error by allowing the cocaine use evidence, the second and third judges perpetuated that error reconsidering the issue and not specifically addressing the new information made available to them. We consider all the information that was available to all three judges.

motion in limine, explaining that "this issue has previously been extensively litigated, and the Court perceives no new or changed circumstances that would require modification of the previous order on this issue," despite the new information provided to the second judge.

The trial occurred before a third judge. In a trial brief, guardian again raised the hearsay issue. The court declined to "revisit the evidentiary rulings that have been made," despite the new information that was not available to the first judge. During trial, guardian did not renew the hearsay objections.

### 2. Evidence at Trial

On direct examination, guardian's counsel asked guardian, "Did you ever see [plaintiff] take any illegal drugs?" He answered, "No, I didn't." Guardian did not testify about any of the hearsay statements he related during his deposition until he repeated them on cross-examination. Guardian did not object to this testimony.

Before Vlassis testified, guardian called Margarita Mouroutsos, another of plaintiff's sisters who had been present at the December 3, 2004, meeting Vlassis described in her deposition. Guardian did not question her about the meeting. On cross-examination, defendants asked Mouroutsos what Hurd had said at the December 3 meeting:

Q: [D]uring that conversation, Ms. Hurd brought up the issue of cocaine use with [plaintiff], correct?

A: Yes, she did.

Q: And she stated, Could his cocaine use have had anything to do with this, didn't she?

A: She said that he had done cocaine in the past, way back in the past, and she was just questioning it.

Again, guardian did not object.

Later, guardian questioned Hurd about the meeting. Her testimony was consistent with that of Mouroutsos. Guardian also asked Hurd about her separate conversation with Kelly about two weeks after the December 3 meeting, almost three weeks after the biopsy procedure, and about three weeks after

plaintiff's irreversible brain damage was known:

Q: At some point after that meeting … did you have an opportunity to speak with Dr. Kelly privately about [plaintiff]?

. . . .

A: I said, "Do you think that maybe [plaintiff] might have had an underlying heart problem that none of us were aware of?

. . . .

A: I said, "[he] used to do drugs in the past, he used to do a little cocaine, and, you know, could it have been in his system and could it have interacted with the anesthesia or could it have set [sic] him into cardiac arrest or"—you know, I was—I don't know if I was asking it right, but I was searching for some kind of answer or reason why this happened.

And he said, you know, "I don't know." He said, "I don't know." And then he asked me, well, did I have knowledge of him doing cocaine, and I said, "Well, no, I wasn't—I was not here when he got admitted into the hospital."

. . . .

Q: He asked you if you had recent knowledge?

A: Yeah. I said, "No, I was not here. His family was here last—the night he got admitted into the hospital," I said, but I didn't—you know, I didn't know. I was not there.

Hurd denied the other statements Kelly attributed to her.

Evidence of cocaine use predominated at trial. In fact, the defense experts' testimony largely relied on Kelly's testimony about alleged recent cocaine use. After the cocaine use evidence was before the jury, guardian also asked Hurd about her personal knowledge of plaintiff's drug use:

Q: And did you have any knowledge of [plaintiff] using drugs in the years after 1998, when you split up? Did you have any direct knowledge of anything?

A: [T]o my knowledge, he was not doing the drugs anymore.

. . . .

Q: Did you ever see [him] using cocaine or any other drugs when he was staying in your house in 2004?

A: No.

Q: And from your interactions with him in that time period, May to just right before this procedure, did you observe any conduct that made you believe that he was on any kind of drugs?

A: No.

. . . .

Q: Did you have any reason to believe that he had been using cocaine in the days around [an earlier emergency room visit]?

A: No.

On cross-examination, defendants questioned Hurd, without objection, about her personal knowledge of plaintiff's drug use:

Q: In fact, you had previously observed [plaintiff] smoking something that you believed to be crack cocaine. True?

A: True.

. . . .

Q: And when was that?

A: Somewheres [sic] in '90—it was shortly before we broke up, and then—I believe, like, '98.

. . .

Q: And did you ask him once in 1997, when he was staying with you, directly whether he was using drugs, and he denied it?

A: I didn't ask him. He said he was not doing it anymore. We were trying to get back together, and he said he was not doing it anymore. He was not going to do it anymore.

Q: Even after that, did you catch him using cocaine in your bedroom?

A: I did.

When defendants called Kelly, he testified, without objection, consistently with his deposition concerning Hurd's statements to him about two weeks after December 3. Hurd disputed much of Kelly's account, but agreed she told him about plaintiff's remote cocaine use.

### B. Preservation of the Issue

■ In addition to contesting the merits of this issue, the parties disagree as to whether guardian preserved his objection to the cocaine use evidence. We conclude the issue was preserved.

We first address defendants' argument that under *Ohler v. United States,* 529 U.S. 753, 120 S.Ct. 1851, 146 L.Ed.2d 826 (2000), guardian is precluded from challenging the trial courts' pretrial evidentiary rulings, and guardian's response that because of such rulings, he "had no option" but to raise the cocaine issue preemptively at trial.

The *Ohler* majority held that "a defendant who preemptively introduces evidence of a prior conviction on direct examination may not on appeal claim that the [in limine ruling admitting] such evidence was error." *Id.* at 760, 120 S.Ct. 1851. It relied on general waiver principles, *id.* at 755, 120 S.Ct. 1851; the government's right to decide after a defendant testifies whether to impeach with a prior conviction, *id.* at 758, 120 S.Ct. 1851; and the possibility that if the defendant does not preemptively introduce the evidence, the trial court may reverse its in limine ruling before cross-examination, *id.* at 758 n. 3, 120 S.Ct. 1851.

Guardian asserts that we should not follow *Ohler,* noting that "four Justices dissented . . . and several states have declined to follow it." [4] We need not decide this question because in several ways, the facts here differ significantly from those in *Ohler.*

First, here, the cocaine hearsay evidence was admitted substantively, not merely for impeachment. *See* L. Timothy Perrin, *Pricking Boils, Preserving Error: On the Horns of a Dilemma After Ohler v. United States,* 34 U.C. Davis L.Rev. 615, 670 (2001) (the concerns associated with the government's right to decide whether to impeach with a prior conviction during cross-examination "do not exist with evidence that relates to the merits of the dispute, at least with regard to evidence introduced by the prosecution· during its case-in-chief, and, thus,

---

**4.** *See, e.g., Pineda v. State,* 120 Nev. 204, 88 P.3d 827 (2004); *State v. Gary M.B.,* 261 Wis.2d 811, 661 N.W.2d 435 (App.2003), *aff'd,* 270 Wis.2d 62, 676 N.W.2d 475 (2004).

[such evidence] should not be controlled by *Ohler* ").

Second, guardian did not preemptively introduce evidence of the unnamed individuals' statements to him or Hurd's statements at the meeting with plaintiff's family and Dean. That evidence was first raised on cross-examination of guardian and Mouroutsos. Thus, even under *Ohler*, guardian would not be precluded from arguing that the court erred in admitting such evidence.[5]

Third, although guardian questioned Hurd about her conversation with Kelly in mid-December, she denied making the statements that guardian had sought to exclude. Thus, unlike in *Ohler*, the jury did not hear the disputed hearsay evidence from Hurd.

Further, we reject defendants' assertion that because guardian and Hurd testified for plaintiff, *Ohler* precludes guardian from objecting to nonhearsay evidence of plaintiff's cocaine use. On direct examination, guardian did not elicit the nonhearsay evidence of which he complains on appeal. Guardian did not waive his objections to Hurd's testimony about observing plaintiff use cocaine twice, the last time in 1997 or 1998. Our supreme court has made it clear that objections lodged in a motion in limine satisfy the purposes of the contemporaneous objection rule. *Uptain v. Huntington Lab, Inc.*, 723 P.2d 1322, 1330–31 (Colo.1986); *see also United States v. Mejia–Alarcon*, 995 F.2d 982, 986 (10th Cir.1993) (recognizing that requiring renewed objections after a definitive ruling may be a needless provocation to the trial court and a distracting interruption during trial).

The pretrial ruling on guardian's motion in limine was clear. The trial court said that the hearsay evidence concerning alleged cocaine use could be introduced. That left no room for plaintiff's attorneys to continue to advance their stated objection. Moreover, once Kelly was allowed to testify about what Hurd allegedly told him, it was to be expected that Hurd would need to clarify or correct the disputed statements attributed to her. At the same time, once Kelly's testimony was

admitted, it became important to refute his suggestion of recent cocaine use. Thus, a renewed trial objection was futile. The trial court's erroneous ruling misdirected the course of the case.

### C. Standard of Review

We review a trial court's evidentiary rulings under an abuse of discretion standard. *E–470 Pub. Highway Auth. v. 455 Co.*, 3 P.3d 18, 23 (Colo.2000). A court abuses its discretion when it rules based on an erroneous application of the law or on a clearly erroneous assessment of the evidence. *People v. Segovia*, 196 P.3d 1126, 1129 (Colo.2008). A trial court's ruling is reversible error only if a substantial right of a party is affected, that is, if the error substantially influenced the outcome of the case. *Fletcher v. People*, 179 P.3d 969, 976 (Colo.2007); *Genova v. Longs Peak Emergency Physicians, P.C.*, 72 P.3d 454, 459 (Colo.App.2003).

### D. Merits

As explained here, we conclude the trial court abused its discretion in admitting the evidence of plaintiff's alleged cocaine use.

The alleged malpractice occurred in 2004. The last time any witness observed plaintiff use drugs was in the 1997–1998 timeframe. This case should have been about whether Waintrub and Kelly met their respective standards of care. Instead, the case was consumed by plaintiff's alleged cocaine use during the 1990s. The jury necessarily had to be distracted by the irrelevant, highly prejudicial, and speculative hearsay-based suggestions concerning plaintiff's alleged past cocaine use.

At trial, Waintrub and Kelly characterized plaintiff as a "chronic cocaine user" based on (1) evidence that Hurd saw him use drugs twice from 1995 to 1998, six to seven years before the 2004 medical procedure at issue, and allegedly reported that information to Kelly after the irreversible brain injury; (2) guardian's testimony that in the early 1990s plaintiff's friends told him that plaintiff used

---

**5.** Under CRE 103, no further objection was required for guardian to preserve the issue for appeal.

drugs, at which point guardian advised plaintiff to stop (even though guardian never witnessed the alleged drug use); (3) the sister's and the family attorney's recounting of Hurd's December 3, 2004 statements; and (4) various medical witnesses' opinions relying on the foregoing evidence.

We conclude that the evidence about plaintiff's alleged cocaine use (1) did not qualify for the CRE 803(4) or former CRE 803(24)[6] hearsay exceptions; (2) concerned the question of responsibility for plaintiff's injury or physical condition and thus was not admissible pursuant to *Clark v. People,* 103 Colo. 371, 376–77, 86 P.2d 257, 259 (1939); and (3) presented a danger of unfair prejudice or confusion of the issues, which substantially outweighed any probative value of the evidence, *see* CRE 403. Accordingly, the trial court abused its discretion in admitting the evidence, and the jury verdict based on that evidence cannot stand. Thus we reverse the judgment and remand for a new trial.

### 1. CRE 803(4)

■ The subject evidence is inadmissible pursuant to CRE 803(4), which provides that the following are not excluded as hearsay:

> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

CRE 803(4). The rationale supporting the Rule 803(4) exception to the hearsay rule is that statements made to a physician are presumptively reliable because the patient trusts that the "effectiveness of the treatment ... may depend largely upon the accuracy of the information provided to the physician." *People v. Jaramillo,* 183 P.3d 665, 669 (Colo.App. 2008). Neither the plain language of the rule nor the rationale supporting the rule applies to the evidence introduced at trial concerning plaintiff's alleged cocaine use.

### a. Plain Language of CRE 803(4)

To be admissible under the rule, the statements would have to be "reasonably pertinent to" plaintiff's diagnosis or treatment. CRE 803(4). The "reasonably pertinent to" language of CRE 803(4) contemplates prospective application of the information provided to the physician. *See King v. People,* 785 P.2d 596, 602 (Colo.1990) (as a foundation for admission, the proponent must establish that the statements are "reasonably pertinent to diagnosis"); *Jaramillo,* 183 P.3d at 669 (where the record did not indicate that the type of dispute or the identity of the assailant was relevant to the victim's treatment and diagnosis, a nurse's testimony that the injuries arose from a domestic dispute was inadmissible hearsay).

Given plaintiff's vegetative state when Hurd disclosed the information about his alleged past cocaine use in the 1990s, it is not reasonable to conclude that the information was necessary to diagnose or treat him in mid-December of 2004. At that late stage, the information had no diagnostic[7] value, but only might have been relevant as to who or what was responsible for his condition, and thus the evidence should have been excluded.

### b. The Reliability Test

In determining whether statements are admissible under CRE 803(4), courts apply a two-part test of reliability: "first, the declarant's motive in making the statement must be consistent with the purpose of promoting treatment or diagnosis; and second, the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis." *People v. Allee,* 77 P.3d 831, 834 (Colo.App.2003). The statements at issue fail both prongs of this test.

Guardian's pretrial motions argued that the first prong of the *Allee* test could not be met because, as a matter of law, CRE 803(4) requires a closer relationship between patient and declarant than plaintiff and Hurd maintained. However, defendants

---

**6.** Now CRE 807.

**7.** Diagnosis is the determination of a medical condition by physical examination or by study of its symptoms. *See Black's Law Dictionary* 518

(9th ed. 2009). By the time Ms. Hurd spoke to Kelly, three weeks after the biopsy, plaintiff's condition had already been diagnosed.

countered guardian's characterization of Hurd as plaintiff's "on-again/off-again girlfriend" with evidence of physicians' orders and other hospital records that referred to Hurd as plaintiff's "common-law wife."

■ Whether the relationship between patient and declarant is sufficiently close for the declarant's statement to be reliable "must be assessed by the court on a case-by-case basis." *State ex rel. Juvenile Dep't v. Pfaff,* 164 Or.App. 470, 994 P.2d 147, 155 (1999); *see, e.g., Floyd v. State,* 959 S.W.2d 706, 712 (Tex.Crim.App.1998) (a statement by father's girlfriend was admissible under a rule identical to CRE 803(4)); *see also* 5 Jack B. Weinstein, *Weinstein's Federal Evidence* § 803.06[5] (2d ed. 2011) ("As the relationship between declarant and patient becomes more distant, the statement becomes less reliable...."). If the record supports the trial court's determination, we will not disturb it. *See, e.g., Bainbridge, Inc. v. Bd. of County Comm'rs,* 53 P.3d 646, 649 (Colo.App. 2001).

Even if Hurd was sufficiently close to plaintiff, the record supports a conclusion that her motive for making the statements in mid-December of 2004 was not to promote his diagnosis or treatment. Hurd explained that she only told Kelly about the remote drug use to obtain information about the reason for plaintiff's condition. *See United States v. White,* 11 F.3d 1446, 1449–50 (8th Cir.1993) [8] (concluding that a victim's statements to a social worker were not admissible where the victim was not seeking psychological or other treatment from the social worker); *Rock v. Huffco Gas & Oil Co.,* 922 F.2d 272, 277–78 (5th Cir.1991) (examining whether the declarant reasonably considered the statements pertinent to diagnosis or treatment); *United States v. Narciso,* 446 F.Supp. 252, 289 (E.D.Mich.1977) (the presumed reliability of the statement is destroyed if the declarant's motive for giving the information is not to aid in diagnosis or treatment). She never said she shared the information to assist in plaintiff's treatment. *See State v.*

*Hinnant,* 351 N.C. 277, 523 S.E.2d 663, 670 (2000) (a statement lacks "inherent reliability" when there is no evidence that declarant had a "treatment motive").

The timing of Hurd's post-injury statements supports our conclusion that she did not make them to help in the diagnosis or treatment of plaintiff's then irreversible brain damage. *Compare People v. Martinez,* 18 P.3d 831, 835–36 (Colo.App.2000) (admitting statements where circumstances showed that the victim's motive in making statements was to obtain treatment), *with People v. Thomas,* 962 P.2d 263, 271 (Colo.App.1997) (defendant's statement that he frequently used illicit drugs, including the day before his arrest, provided during his initial booking that included a medical history questionnaire, was not furnished to obtain a medical diagnosis and thus did not satisfy CRE 803(4)); *Brown v. Seaboard Airline Railroad Co.,* 434 F.2d 1101, 1104 (5th Cir.1970) (causation testimony did not relate to a condition or symptom for which treatment was sought and thus the testimony was not admissible as an exception to the hearsay rule), *Hinnant,* 523 S.E.2d at 670 (statements made two weeks after the initial medical examination were not reasonably pertinent to medical diagnosis or treatment), *and State v. Waddell,* 351 N.C. 413, 527 S.E.2d 644 (2000) (concluding that victim's statements to licensed psychological associate concerning sexual abuse were not admissible under medical diagnosis and treatment exception to hearsay rule where there was no evidence of medical treatment motivation on part of victim). According to Kelly, Hurd told him about the cocaine use more than a week after the 2004 medical procedure and after plaintiff's irreversible brain damage. The statements therefore fail the first prong of the reliability test.

■ Second, the statements do not contain information that is reasonably relied on by a physician in treatment or diagnosis, as required under the second prong of the reliability test. *See Allee,* 77 P.3d at 834. Although, in general, it may be reasonable for a

---

8. Where there is no Colorado law directly on point and the federal and Colorado rules are nearly identical—here they are identical—case law interpreting the federal rule is persuasive in the analysis of the Colorado rule. *Harding Glass Co. v. Jones,* 640 P.2d 1123, 1125 n. 3 (Colo. 1982).

treating physician to rely on medical or other history in treating a patient, here, plaintiff's condition (vegetative state) and the timing of the information (after-the-fact) renders it unreasonable that Kelly, who was no longer providing medical care, or other physicians would have reasonably relied (or did reasonably rely) on Hurd's information to continue plaintiff's medical diagnosis and treatment. *See King*, 785 P.2d at 602 (requiring the proponent to establish, as a foundation for admission, that the psychiatrist relied on the information in arriving at his pertinent opinion). The alleged malpractice had already occurred.

If Kelly had found the information relevant to plaintiff's continued treatment, he should have relayed the information or made some use of it, other than defensively at trial. If the information was relevant, Kelly's failure to chart it or share it with the other doctors may constitute a failure to meet the standard of care. That Kelly defended his inaction by stressing that plaintiff's brain damage was irreversible, and that the information would not have altered plaintiff's medical outcome, stands in stark contrast to his current efforts to give the information diagnostic value. *Samaan v. St. Joseph Hosp.*, 764 F.Supp.2d 238, 240 (D.Me.2011) (a letter from a physician, which did not explain how the information affected the doctor's diagnosis, was not admissible under Fed.R.Evid. 803(4)).

Moreover, Kelly and the medical facility that housed plaintiff were in a unique position to examine or test (or at least request the examination or testing of) plaintiff's blood or hair to substantiate (or rebut) Hurd's alleged statements. That they did nothing to validate (or refute) Hurd's suggestion further supports our conclusion that the after-the-fact information about past cocaine use was not material to plaintiff's medical diagnosis or treatment, but only could bear upon fault for plaintiff's condition. For the foregoing reasons, the reliability test is not satisfied, and the evidence based on Hurd's hearsay

statements is not admissible under CRE 803(4).

### 2. Other Hearsay Statements

■ The trial courts' pretrial rulings did not specifically address objections to guardian's deposition testimony that he was told in the 1990s that plaintiff was using cocaine or Vlassis's deposition testimony that Hurd had told the family and Dean that plaintiff used cocaine "many years ago." For the same reasons stated above, the trial court abused its discretion in admitting these hearsay statements.

### 3. Residual Exception

■ We also conclude that the testimony regarding plaintiff's past drug use is not admissible under former CRE 803(24).[9] We cannot say that the statements have the necessary guarantees of trustworthiness. "Courts considering the trustworthiness of statements have examined the nature and character of the statement, the relationship of the parties, the probable motivation of the declarant in making the statement, and the circumstances under which the statement was made." *People v. Fuller*, 788 P.2d 741, 745 (Colo.1990). As explained above, the parties disagree about the nature and character of the statements, and about Hurd's motivation in making these statements. Hurd testified that she last saw plaintiff use cocaine in the 1997–1998 timeframe. She was not with him when he was admitted to the hospital and was not aware of any recent cocaine use. The only other testimony about cocaine use was other hearsay about remote use in the 1990s. Accordingly, no guarantees of trustworthiness are present here. *Compare People v. Preciado–Flores*, 66 P.3d 155, 164 (Colo.App.2002) (insufficient guarantees of trustworthiness where declarant had no personal knowledge of the circumstances surrounding the death of her brother), *with Vasquez v. People*, 173 P.3d 1099, 1107 (Colo. 2007) (sufficient circumstantial guarantees of trustworthiness where declarant identified

---

9. Former CRE 803(24), the residual hearsay rule, is now codified at CRE 807. However, the requirements for admissibility are the same: the statement must have "circumstantial guarantees of trustworthiness," be offered as evidence of a

material fact, be more probative on the point for which it is offered than other evidence the proponent can procure, and serve the general purposes of the rules and the interests of justice.

defendant's voice on telephone messages, and those messages existed when the statements were made to police officers).

In addition, the statements allegedly made to Kelly were not more probative than any other available evidence defendants could have procured. As discussed, plaintiff's care facility and the doctors had the ability to order testing that would have established whether plaintiff used cocaine near the time of the 2004 procedure. After Hurd told Kelly about plaintiff's past cocaine use, if Kelly was concerned about the effects on plaintiff, he could have confirmed current use. Having failed to do so, Kelly and Waintrub should not benefit now by insisting on admission of disputed and highly prejudicial statements.

### 4. Statements Relating to Responsibility for Injury

■ Hearsay statements relating to fault which are not relevant to diagnosis or treatment are inadmissible. *Clark,* 103 Colo. at 377, 86 P.2d at 259 (refusing to admit hearsay statements made to a physician because "responsibility [for the injury or physical condition] cannot be fixed in this roundabout way as a substitute for legal evidence that is not available").

The dissent dismisses *Clark* on the basis that it "predates adoption of the Colorado Rules of Evidence by almost four decades." However, the adoption of the Colorado Rules of Evidence, which became effective January 1, 1980, does not affect the continued viability of *Clark.* Because the Colorado Supreme Court has never overruled *Clark,* it remains the law in Colorado. Moreover, CRE 803(4) is modeled after the Federal Rules of Evidence,[10] which, like *Clark,* recognize that Rule 803(4) bars as hearsay out of court statements relating to fault which are not relevant to diagnosis or treatment. Fed. R.Evid. 803(4) advisory comm. note; *Roberts v. Hollocher,* 664 F.2d 200, 204 (8th Cir.1981).

The statements at issue were made when there was no question about plaintiff's condition. Defendants, the family, and Hurd knew that the damage was irreversible, that there was no hope of restoring plaintiff's brain function. Given plaintiff's vegetative state, the post-injury statements could only have been made to determine who or what was responsible for plaintiff's condition. *Clark,* 103 Colo. at 373, 86 P.2d at 259; *see also Brown,* 434 F.2d at 1104 (excluding plaintiff's statement to a physician about the cause of plaintiff's injuries, made four days after those injuries); *State v. Gattis,* 166 N.C.App. 1, 601 S.E.2d 205, 210 (2004) (defendant's statement to nurse that a gun accidentally discharged was not reasonably pertinent to medical diagnosis or treatment and was not admissible, even though defendant claimed that physician needed to know that a bullet possibly was lodged in his body; the court found that the statement was relevant to fault, not to treatment of the wound).

The dissent relies on *People v. Oldsen,* 697 P.2d 787, 788–89 (Colo.App.1984), *aff'd on other grounds,* 732 P.2d 1132 (Colo.1986), *superseded in part by* § 13–90–106(1)(b)(II), C.R.S.2011, *as stated in People v. District Court,* 791 P.2d 682, 685 n. 3 (Colo.1990), and other cases involving child sexual assault victims for the proposition that statements concerning responsibility are admissible. This reliance is misplaced because in those cases identification of the perpetrator was pertinent to the victim's ongoing mental health diagnosis and treatment. In *Oldsen,* a sex assault victim's statement identifying her father as the assailant was initially held to be admissible as pertinent to "diagnosis and treatment" of her emotional and developmental problems. In that case, mental health treatment providers testified that addressing the source of the assault would assist in the victim's on-going treatment for the emotional scars caused by the assault. 697 P.2d at 788.

On appeal, however, the Colorado Supreme Court concluded that, absent evidence that the child-victim was capable of recognizing the need to provide accurate information for purposes of diagnosis or treatment when the statements were made, there was no basis to admit the hearsay under CRE 803(4). *Oldsen,* 732 P.2d at 1135–36. The supreme court ultimately affirmed admission of evi-

---

**10.** *See infra* fn 8.

dence of the source of the injury pursuant to former CRE 803(24).

In contrast to *Oldsen,* here there is no dispute that plaintiff's brain damage was irreversible. Thus, statements made days *after* plaintiff's brain damage were not made "for purposes of medical diagnosis or treatment." The statements had no relevance to medical treatment plaintiff would receive. The statements could only be relevant to responsibility or fault.

That Kelly did nothing with the cocaine use information allegedly relayed to him by Hurd is telling. *See Allee,* 77 P.3d at 834–35 (Colo.App.2003) (where the record did not indicate that identification of the victim's assailant was necessary to the physician's diagnosis or treatment, the challenged hearsay was inadmissible and CRE 803(4) did not apply); *see also Cook v. Hoppin,* 783 F.2d 684, 690 (7th Cir.1986) (patient's hearsay statements were inadmissible where physician testified that he had not relied on them in his treatment of patient). Kelly did not add the information to plaintiff's medical chart. Kelly did not share the information with plaintiff's subsequent treatment providers. In fact, Kelly excused his failure to chart and share Hurd's information, on the basis that it was irrelevant to plaintiff's treatment, thereby contradicting any such suggestion.

### 5. CRE 403

■ Guardian next asserts that even if the statements satisfied a hearsay exception, they were highly prejudicial and confusing to the jury, and therefore should have been excluded under CRE 403. We agree and conclude that the trial court abused its discretion in admitting the statements. *See Yusem v. People,* 210 P.3d 458, 468–69 (Colo. 2009) (excluding evidence where the collateral issues had the potential to confuse the jury and lead the jury astray).

Under CRE 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ... [or] confusion of the issues." Even if the post-injury information, which was not substantiated and only related to remote cocaine use (1997 or 1998 at the latest), had some minimal probative value as to alleged malpractice in 2004, the trial court remained obligated to determine, under CRE 403, whether the evidence should be excluded because its probative value was substantially outweighed by the danger of unfair prejudice or confusion of issues.[11] CRE 403.

The mere suggestion of plaintiff's alleged cocaine use created a danger of unfair prejudice and threatened to confuse the jury. *See* CRE 403. The first judge, in ruling on plaintiff's motion in limine on the basis of incomplete information later made available to the second and third judges, acknowledged that the evidence was "intensely prejudicial to the plaintiff[ ] in this case," but nevertheless concluded that "on balance ... it is appropriate to permit that information in." We disagree.

While there was medical testimony that recent (2002–2004 timeframe) cocaine use might be medically significant, there was no evidence that anyone witnessed plaintiff using drugs from 2002 to 2004. The last time Hurd saw plaintiff use drugs was in 1997 or 1998, and his siblings never witnessed drug use. Neither Kelly nor the medical facility tested plaintiff for cocaine. *See Samaan,* 764 F.Supp.2d at 240 (where physician did not explain how the information affected the diagnosis, material was not admitted under Fed.R.Evid. 803(4)).

Even if evidence about drug use in the 1990s had some relevance to a 2004 procedure, the danger of unfair prejudice substantially outweighed any probative value. *See Yusem,* 210 P.3d at 468–69 (excluding evidence where the collateral issues had the potential to confuse the jury and lead the jury astray); *see also Therrien v. Target Corp.,* 617 F.3d 1242, 1257 (10th Cir.2010) (the district court properly excluded, on the basis of undue prejudice, evidence that post-traumatic stress disorder or other mental illness caused plaintiff to act violently and

---

**11.** As with the hearsay objection, we conclude that the motion in limine also preserved the CRE 403 objection.

other information about his violent criminal past, where plaintiff alleged that defendant negligently caused injuries he incurred while helping defendant's security officer apprehend a shoplifter); *Rodriguez v. Schweiger,* 796 F.2d 930, 935 (7th Cir.1986) (in a civil rights (§ 1983) case, trial court properly excluded, based on potential prejudicial impact, expert medical evidence concerning a psychiatric disorder afflicting the defendant police officer who allegedly shot, and threatened to kill, the plaintiff); *Mehus v. Emporia State University,* 326 F.Supp.2d 1221, 1226 (D.Kan.2004) (in a disparate treatment case, evidence of a male co-worker's sexually explicit e-mails was properly excluded because its relevance, if any, was substantially outweighed by the danger of unfair prejudice and waste of time under Fed.R.Evid. 403).

Because the cocaine use evidence did not properly fall within the exceptions of CRE 803(4) or former CRE 803(24), related to who (or what) was responsible for plaintiff's injury or physical condition, and presented a danger of unfair prejudice or confusion of the issues, we conclude that the trial court abused its discretion in admitting the evidence. *See Uptain,* 723 P.2d at 1329 (record supported the conclusion that the prejudicial effect of the evidence far outweighed its probative value).

That abuse of discretion substantially prejudiced plaintiff. *Id.* Accordingly, we remand for a new trial. We address some additional contentions of error because they are likely to arise on retrial.

### III. Disqualification of Guardian's Counsel

■ Guardian contends the trial court erred in disqualifying his counsel, Patricia Dean. We discern no error.

■ Under the "advocate-witness rule," a lawyer "cannot maintain dual roles as advocate and witness in the same matter before the same tribunal." *Fognani v. Young,* 115 P.3d 1268, 1272 (Colo.2005). The rule is meant to "avoid the confusion that results for a jury when the lawyer acts in the dual roles of witness and advocate." *People v. Pasillas–Sanchez,* 214 P.3d 520, 525 (Colo.App. 2009).

■ Counsel "shall not act as advocate at a trial in which [she] is likely to be a necessary witness," unless

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.

Colo. RPC 3.7(a). Whether the moving party has demonstrated that opposing counsel is "likely to be a necessary witness" requires the court to consider "the nature of the case, with emphasis on the subject of the lawyer's testimony, the weight the testimony might have in resolving disputed issues, and the availability of other witnesses or documentary evidence which might independently establish the relevant issues." *Fognani,* 115 P.3d at 1274.

Even when the court disqualifies a lawyer, another lawyer from the same law firm may act as counsel in the case, unless precluded from doing so by factors not at issue here. *See* Colo. RPC 3.7(b); *Fognani,* 115 P.3d at 1274 (remanding for the trial court to consider whether counsel's firm also should have been disqualified, and noting that "disqualification of the advocate-witness is a personal disability that is normally not imputed to the attorney's law firm" (quoting Richard F. Hennessey, *Colorado's New Rules of Professional Conduct: A More Comprehensive and Useful Guide for Lawyers,* 21 Colo. Law. 10 (Oct. 1992))).

■ We review a trial court's decision to disqualify counsel for an abuse of discretion. *Fognani,* 115 P.3d at 1271–72; *see also People v. Hagos,* 250 P.3d 596, 610 (Colo.App. 2009) ("The unpredictable nature of jury trials and the ebb and flow of strategy and tactics render it impossible conclusively to determine in advance whose testimony will actually be likely or necessary.").

Here, Dean became involved in plaintiff's care shortly after his injury and as a result of her friendship with his sister, Margarita Mouroutsos, also an employee at the law firm of Holland & Hart. Dean was at the December 3, 2004 meeting when Hurd mentioned

plaintiff's cocaine use. Thereafter, plaintiff's family retained Dean to help them get a guardian appointed, and later asked her to file a claim on plaintiff's behalf.

When this lawsuit was filed, Dean and Bruce Jones, another Holland & Hart attorney, were both counsel of record. Dean defended and took several depositions, including Kelly's. Defendants deposed Dean regarding her involvement with plaintiff's care before taking on representation of guardian.

Several months before the first trial, defendants moved to disqualify Holland & Hart as guardian's counsel. They argued that Dean was a necessary witness, her personal recollections contradicted those of her clients and several other witnesses, her role as an advocate-witness prejudiced their right to discovery and presentation of evidence, and the conflict extended to her law firm.

At a hearing on the motion, the trial court addressed Colo. RPC 3.7 and relevant case law, including *Fognani*. It disqualified Dean, explaining:

> I do find that Ms. Dean is likely to be a necessary witness at trial because she does give some different recollection of conversations both with the family members and with Dr. Kelly, there really is no other way that the Defendants can get this testimony except [from] Ms. Dean herself.
>
> . . . .
>
> The court is concerned that if Ms. Dean is believed about her recollection of Dr. Kelly's statements, the credibility of her own client is going to be questioned significantly. . . .
>
> . . . .
>
> There is no doubt in my mind that the jury would be extremely confused if I allowed Ms. Dean to ask questions at trial of other witnesses about meetings and conversations where she, herself, has personal knowledge of those conversations. So therefore I am granting the motion as to Ms. Dean being a trial advocate.

The court found that the exceptions under Colo. RPC 3.7(a)(1) and (2) were not applicable. However, under Colo. RPC 3.7(a)(3), it did not disqualify Dean from participating in

pretrial preparation because doing so "would cause such an extreme hardship to the plaintiff[ ]." Nor did the court disqualify Holland & Hart, noting that "Mr. Jones has been on this case from the beginning" and that guardian consented to continued representation by the firm.

Defendants' motion contained several examples of differing recollections by and among Dean, plaintiff's family members, and other witnesses. For example, defendants raised the following issues:

- Hurd's relationship with plaintiff, asserting that Vlassis had denied a close relationship between the two, while Dean had testified in her deposition that Hurd was introduced to her as plaintiff's girlfriend, and Kelly had testified that he understood her to be plaintiff's "significant other";
- Kelly's demeanor when the family first met him, asserting that Dean's testimony did not corroborate Vlassis's statement that Kelly had been crying and appeared to have a guilty conscience.

Guardian countered these and other assertions, arguing that several of them lacked evidentiary support and others mischaracterized the record. However, the court noted that it had read all of the filings related to the motion to disqualify and was "very well-versed in both the law and the facts of this case."

Having reviewed defendants' disqualification motion and plaintiff's response, we discern no abuse of discretion. Given our prior discussion about the cocaine use evidence, on retrial Dean will not be permitted to testify about whether cocaine use was mentioned at the December 3 meeting.

Accordingly, we need not address defendants' assertion that, even if the trial court abused its discretion in disqualifying Dean, the error was harmless.

## IV. Remaining Evidentiary Issues

Guardian also contends the trial court abused its discretion in resolving several evidentiary issues. Defendants agree that, with the exception of evidence regarding previous-

ly dismissed defendants and Medicare and Medicaid payments, which we address below, guardian preserved these issues.

## A. Dr. Harte

 Guardian asserts that the trial court erroneously allowed Dr. Harte, an infectious disease specialist and one of plaintiff's treating physicians, to testify beyond the scope of his endorsement as defendants' expert. We conclude that any error was harmless.

Under C.R.C.P. 16 and 26, parties must designate all expert witnesses and provide a description of their testimony in advance of trial. Failure to do so generally precludes the undisclosed expert testimony, *see, e.g., Locke v. Vanderark*, 843 P.2d 27, 30 (Colo. App.1992) (*Vanderark*), but its admission is subject to harmless error analysis, *see, e.g., Ajay Sports, Inc. v. Casazza*, 1 P.3d 267, 275 (Colo.App.2000).

Here, before Harte testified, guardian's counsel objected, saying, "I anticipate that counsel may try to elicit from [Harte] what he would have done if he had been called on November 23 and 24, and that would be outside the scope of the designation." Waintrub's counsel responded, "[T]hat's one of the issues in this case that has been constantly brought up by plaintiff [sic] counsel which is ... if they would have called the infectious disease doctor, he would have done something differently." The court decided

> to permit the testimony [with] the caveat that it be in the form of a hypothetical circumstance, and that is because the record is replete with references to the fact that it was a deviation from the standard of care for them not to have brought in the disease specialist, and further, that he was the actual disease specialist brought in, and he did certain things immediately. And that's been argued and articulated before the jury in terms of why he did those things and what it meant.

Thereafter, Harte testified in the form of a hypothetical that he would have agreed with Waintrub's recommendations if he had been contacted before Kelly performed the needle biopsy.

Although our review is hampered by guardian's lack of record citations, defendants neither dispute that Harte's endorsement failed to disclose this opinion nor assert justifiable excuse. Instead, Waintrub argues that guardian opened the door to this testimony. But Waintrub supplies record citations only to his own examination of a different doctor and to the trial court's ruling quoted above, which are insufficient to guide our review. *See* C.A.R. 28(k); *O'Quinn v. Baca*, 250 P.3d 629, 632 (Colo.App.2010) (stressing the need for parties to provide pinpoint record citations). Our independent, albeit limited, review of the voluminous record indicates that guardian did not open the door to this testimony.

However, even if the court erroneously permitted Harte to testify beyond the scope of his endorsement, we agree with Waintrub that any error was harmless for two reasons. First, the propriety of ordering the needle biopsy was central to guardian's case, and guardian's cross-examination shows that he was prepared to counter Harte's opinion. *See, e.g., Ajay*, 1 P.3d at 275 (in concluding that defendant was not prejudiced when plaintiff's expert exceeded the scope of his endorsement in testifying about insolvency, court reasoned, in part, "defendant was aware that insolvency would be contested at trial, [and] had listed his own expert on insolvency in his C.R.C.P. 26 disclosures"). Second, Dr. Radetsky, another infectious disease specialist called as a defense expert, testified that, had he been consulted before Kelly performed the needle biopsy, he would have approved the procedure. Because Harte's later testimony was cumulative of Radetsky's, it did not prejudice guardian. *See Antolovich v. Brown Group Retail, Inc.*, 183 P.3d 582, 598 (Colo.App.2007).

## B. Expert Bias

 Guardian next asserts that the trial court abused its discretion in prohibiting him from cross-examining two of defendants' experts who were represented by one of the defense attorneys in unrelated prior litigation. We disagree.

Before defense experts Dr. Golditch and Dr. Gershten testified, guardian raised the

issue of cross-examining them on this subject. The trial court prohibited the inquiry, ruling that under *Vanderark* and CRE 403,

> [w]hile it may have some relevance to the issue of bias and credibility of the witness, that relevance is minimal under the circumstances ... [and] it would necessitate some explanation by the witness of the instances that are being referred to, which ... would be misleading or confusing to the jury and divert their [sic] attention from the very real issues in dispute here.

In *Vanderark,* also a medical malpractice case, the division determined that the trial court erred in allowing counsel to cross-examine an expert witness about having been sued previously for malpractice and defamation. 843 P.2d at 31. It reasoned, in part, that "inquiry into unrelated litigation requires ... that the witness be permitted to explain the nature, circumstances, and the decision, if any, in each case to rehabilitate the challenged credibility." *Id.* It explained that "this evidence would divert the jury's attention from the dispositive issues in the case" and "the sideshow would take over the circus." *Id.* (quoting *People v. Taylor,* 190 Colo. 210, 213, 545 P.2d 703, 706 (1976)).

Guardian correctly asserts that "the concern in *Vanderark* [was] evidence of prior malpractice suits, not the fact that defense counsel previously represented a witness he now endorses as an expert." However, here the trial court relied on two of the concerns the *Vanderark* division cited—confusing the jury and requiring the expert to explain collateral matters. In our view, the court acted within its discretion in doing so.

Further, even if the trial court abused its discretion, the error was harmless. The court allowed guardian to probe the bias issue by establishing that both experts had worked with defense counsel previously. *See id.* at 32 ("we think harmless error is indicated by the record as a whole which reflects that the neurosurgeon was effectively impeached on a number of other topics relating to his credibility"); *see also, e.g., Stam v. Mack,* 984 S.W.2d 747, 751–52 (Tex.App. 1999) (in medical malpractice case, holding harmless any error by trial court in prohibiting evidence that expert witness had previ-

ously been represented by defense counsel, because plaintiff suggested bias by establishing that expert and defense counsel had prior professional relationship).

## C. Litigiousness

Guardian next asserts that the trial court abused its discretion in allowing defendants to introduce evidence of when plaintiff's family first retained an attorney to bring this action, while prohibiting guardian from questioning Kelly about when he first contacted his malpractice carrier. We discern no grounds for reversal on this issue.

Guardian moved pretrial to exclude evidence of when he hired an attorney for this action. The trial court denied the motion, ruling that "[u]nder the circumstances of this case, it appears that the time and circumstances of the retention of counsel is relevant, and in fact was addressed by Plaintiff at the first trial." On direct examination of Mouroutsos and Dean, guardian established that plaintiff's family was not contemplating bringing a lawsuit immediately after he was injured and that Dean was first retained when the family sought a guardianship for plaintiff. Defendants later cross-examined Vlassis on these topics, and her testimony corroborated that of Mouroutsos and Dean. Specifically, she said that the family discussed getting plaintiff a guardian not immediately after his injury but, rather, "way later," and that filing a lawsuit "didn't come up at that time."

Guardian asserts, but fails to explain how, he was harmed by defendants' cross-examination of Vlassis. *See, e.g., Dunton v. Whitewater West Recreation, Ltd.,* 942 P.2d 1348, 1352 (Colo.App.1997) (perceiving no abuse of discretion where party failed to explain how trial court's ruling prejudiced him). Even if the trial court abused its discretion, we discern no prejudice because the cross-examination failed to establish that plaintiff's family hired Dean for this action shortly after his injury.

On cross-examination of Kelly, guardian sought to elicit when he had first contacted his malpractice carrier. Guardian's counsel asked him, "[W]hen you had the meeting on

December 3, you had no idea that you might need to document things because you might end up in this witness chair, correct?" Kelly responded, "Correct." Guardian's counsel then conferred with defense counsel and the court and said, "He reported it to his insurance company on the 29th [of November]. That is opening the door for me to now raise that very issue to impeach him because it goes directly to his credibility on that very issue." Defendants objected, and the trial court precluded the inquiry, explaining that Kelly's testimony had not "opened the door."

We reject guardian's assertion that the trial court abused its discretion in not allowing him to question Kelly about when he first contacted his malpractice carrier because the carrier required such notice. *See, e.g., Liber v. Flor,* 160 Colo. 7, 20, 415 P.2d 332, 339 (1966) ("In Colorado, during the actual trial of a case, it is improper to mention insurance in either a positive or negative manner."). Further, guardian's assertion that Kelly "opened the door" to this line of questioning misperceives the concept of "opening the door," which occurs "when one party introduces evidence that causes another party to introduce counterproof that would otherwise be inadmissible but for the first party's introduction of the subject matter." *Itin v. Ungar,* 17 P.3d 129, 132 n. 4 (Colo.2000). Guardian cannot both raise the issue with Kelly and then complain that Kelly's answer required counterproof using otherwise inadmissible evidence.

### D. Dismissed Defendants

Guardian next asserts that the trial court abused its discretion in permitting defendants to cross-examine some of plaintiff's family members about allegations in the initial complaint and the dismissal of certain defendants. We discern no basis for reversal on this issue.

Before cross-examining Vlassis, defense counsel told the court and guardian that, consistent with a ruling from the first trial, defendants intended to question some of plaintiff's family members about allegations against other doctors that were made in a pleading filed in this case, without mentioning that the doctors had been parties to the lawsuit. The court agreed, noting that such allegations "would be construed as a judicial admission attributable to [guardian]," but requiring that questions about such allegations

> not refer[ ] to a lawsuit in particular, because ... that goes beyond the bounds of impeachment, and balancing that under [CRE] 403, the prejudice to the credibility of the witness is outweighed by the probative value, there is no need for the jury to know that there were all these other people in the lawsuit.

Defendants questioned Vlassis and guardian about allegations made against several other doctors. Vlassis denied that such allegations were made; guardian admitted that they had been.

We agree with defendants that guardian failed to preserve this issue. The portions of the record guardian cites divulge no specific objection by him but, rather, mere argument in response to defense counsel's colloquy with the trial court. Further, that argument was premised on Vlassis lacking any foundation to answer questions about the initial complaint, not on any prejudice caused by such questions. Thus, guardian "is deemed to have waived the objection and cannot raise it on appeal." *People v. Watson,* 668 P.2d 965, 967 (Colo.App.1983).

And in any event, even if guardian preserved this objection, we discern no abuse of discretion. The jury did not hear about any legal claims asserted against other doctors or about dismissal of those doctors. Instead, defendants sought to illustrate that plaintiff's family was displeased with the performance of several physicians, not just that of defendants.

### E. Medicare and Medicaid

Guardian next asserts that the trial court abused its discretion in permitting defendants to introduce evidence of the amount of plaintiff's medical bills paid by Medicare and Medicaid.

Before the first trial, guardian moved to "exclude evidence of payments received from collateral sources." The trial court's order stated, in pertinent part:

[T]he Court GRANTS Plaintiffs' [sic] Motion in part, and excludes any mention or evidence relating to the amounts of payments through Medicaid or Medicare; DENIES the Motion in part, and allows evidence relating to the fact that payments were made by those entities . . . .

At trial, guardian introduced an exhibit summarizing the amounts billed for plaintiff's care. Defendants argued, "[I]f Plaintiff opens the door on the amount, we can go in and show that all of those bills have been paid for by Medicare/Medicaid." The trial court agreed with defendants and "permit[ted] the defense to present evidence regarding the true amount paid of the medical expenses," thereby effectively reversing the pretrial ruling granting in part guardian's motion. Guardian objected to this change of course, asserting that under *Tucker v. Volunteers of America Colorado Branch*, 211 P.3d 708 (Colo.App.2008), *aff'd sub nom. Volunteers of America Colorado Branch v. Gardenswartz*, 242 P.3d 1080 (Colo.2010), the amount billed can be introduced into evidence but not the amount paid. On appeal, guardian does not assert error in the trial court's partial denial of his motion. Thus, we focus only on the narrow question of whether the court abused its discretion in admitting evidence of certain specific amounts paid by Medicare and Medicaid.

We reject defendants' assertion that "no such evidence was admitted at trial." For example, during cross-examination of Helen Woodard, a rehabilitation counselor and life care planner, defendants established that Medicare or Medicaid had paid for several specific items, including "medical equipment"; "doctors' appointments"; "transportation"; "hospitalizations"; "prescriptions"; "[o]ccupation[al therapy], speech therapy and physical therapy"; and "[d]iagnostic tests and vaccinations." In light of guardian's previously admitted exhibit, we conclude that such testimony effectively established the amounts paid by Medicare and Medicaid for these items.

Assuming, without deciding, that the collateral source rule applies to governmental benefits, we agree with guardian that the better practice would have been for the trial court to exclude even indirect evidence of the amounts paid by Medicare and Medicaid. *See Volunteers of America Colorado Branch v. Gardenswartz*, 242 P.3d at 1083 ("[t]o ensure that a jury will not be misled by evidence regarding the benefits that a plaintiff received from sources collateral to the tortfeasor, such evidence is inadmissible at trial"). On retrial, this information should be excluded.

### V. Costs

Finally, guardian contends defendants' bill of costs should have been substantially reduced as excessive. In light of the foregoing disposition, the trial court's costs award cannot stand. Rather, the trial court may need to revisit the cost issue once the new trial concludes.

### VI. Remaining Issues

Because it is uncertain that the same judge will preside on retrial, we do not address the alternate juror deliberations issue.

The judgment and order are reversed, and the case is remanded for a new trial consistent with this opinion.

Judge ROY concurs.

Judge WEBB dissents.

Judge WEBB dissenting.

In reversing the trial court's discretionary decision, the majority mischaracterizes the hearsay at issue as a statement of blame and applies an overly narrow approach to the diagnostic process. Therefore, I respectfully dissent.

### I. Hearsay Evidence of Plaintiff's Recent Cocaine Use

#### A. Facts Relevant to Dissent

When Ms. Hurd allegedly made the hearsay statements concerning plaintiff's recent cocaine use to Dr. Kelly, plaintiff was suffering from severe and irreversible brain injury. His health care providers then understood that toxic material released from the cyst during the needle biopsy had caused cardiac arrest. But no one—neither Ms. Hurd, nor

Dr. Kelly, nor any of the other physicians—knew *why* routine resuscitation procedures had failed to revive an otherwise apparently healthy patient of plaintiff's age for several minutes, during which he suffered the brain damage. In opposing guardian's motion in limine to exclude the statements as hearsay, defendants offered an explanation for this medical mystery—physiological changes associated with frequent cocaine use could have reduced the effectiveness of the resuscitation procedures used on plaintiff. The first trial judge agreed, noting that cocaine use was "really the key to this case," and held the statements admissible under CRE 803(4).

At that time, Ms. Hurd's whereabouts were unknown. After she surfaced following the mistrial, she submitted an affidavit admitting having discussed with Dr. Kelly plaintiff's cocaine use in the 1990s, but denying all statements that plaintiff had done so recently. At the second trial, she testified consistent with the affidavit. Thus, the record includes no direct evidence of her intent as to the latter statements.

### B. CRE 803(4)

CRE 803(4) exempts from the hearsay rule:

> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

The federal rule is identical and includes a lengthy comment. The Colorado rule does not include a narrative comment.

### C. Scope of Review

The trial court has "wide discretion" in determining admissibility of evidence under hearsay exceptions. *Canape v. Peterson*, 878 P.2d 83, 88 (Colo.App.1994), *aff'd*, 897 P.2d 762 (Colo.1995); *accord People v. Lagunas*, 710 P.2d 1145, 1148 (Colo.App.1985) ("broad

discretion"). In reviewing for an abuse of discretion, "we ask not whether we would have reached a different result but, rather, whether the trial court's decision fell within a range of reasonable options." *E–470 Pub. Highway Auth. v. Revenig*, 140 P.3d 227, 230–31 (Colo.App.2006).

### D. The Statements Were Within the Plain Language of CRE 803(4)

According to Dr. Kelly, Ms. Hurd asked him "if cocaine could have had anything to do with what happened," and then described plaintiff's recent use of the drug. CRE 803(4) includes statements about "medical history." Drug use would be part of a patient's medical history. *See Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 (10th Cir. 2001) ("[D]rug use is an important indicator of a patient's physical condition and is crucial to determining whether to undertake additional testing.").[1]

CRE 803(4) also includes statements concerning the "cause" of "past ... symptoms." During the needle biopsy, plaintiff went into shock and his heart stopped. Before he could be revived, he suffered brain damage. Thus, shock was a "past symptom," and Ms. Hurd provided information about recent cocaine use as its potential cause.

Nevertheless, the majority would not apply CRE 803(4) because, it asserts, the statements fail the reliability test and only allocate blame. I begin with the latter assertion because if the majority is correct, it obviates the reliability inquiry.

### E. Statements of Responsibility

The majority says, "Hearsay statements relating to fault which are not relevant to diagnosis or treatment are inadmissible." I would not apply this limitation here because doing so fails to distinguish causation from fault and is at odds with recent Colorado law.

Initially, as the majority's citations illustrate, most cases turning on fault involve victim statements identifying the perpetrator

---

1. *See* R. Mostellar, *The Maturation and Disintegration of the Hearsay Exception for Statements for Medical Examination in Child Sexual Abuse Cases*, 65 Law & Contemp. Probs. 47, 56 (Winter 2000) ("The drafters certainly did intend to change the exception from its orthodox common law formulation, making three major changes. First, the exception includes patients' statements of their medical histories, along with statements relating to then-existing conditions.").

of a crime, often sexual assault against a child. Here, these cases are uninformative for at least the following reasons:

- Such an assault usually does not leave any medical question unanswered. *See State v. Hinnant,* 351 N.C. 277, 290, 523 S.E.2d 663, 671 (2000) ("The initial examination ... consisted of an external genital exam. That examination did not reveal any signs of trauma.").

- Child victims may not comprehend the medical setting. *See United States v. White,* 11 F.3d 1446, 1450 (8th Cir.1993) ("there was no evidence that [the child declarant] thought he was talking to a medical professional").

- The medical setting has been exploited to obtain a damning accusation from the child victim. *See Hinnant,* 351 N.C. at 290, 523 S.E.2d at 671 ("Inherent in this type of suggestive questioning is the danger of planting the idea of sexual abuse in the mind of the child.").

The majority cites no case, nor have I found one, in which the fault exception has been applied to exclude a statement about causation. *See, e.g., State v. Robinson,* 718 N.W.2d 400, 404 (Minn.2006) (victim's "description of a hand slap as the mechanism of her injury inadmissible under the medical diagnosis exception"); *State v. Leone,* 581 A.2d 394, 399 (Me.1990) (hearsay exception "only sufficiently broad to cover the *cause* of Leone's injury (a gunshot), but not statements of *fault* or *blame* (i.e., that Leone did not initiate the shootout ...)"). The absence of any such authority can be explained by considering the hearsay declarant's interest in "the accuracy of the information provided." 5 Jack B. Weinstein, *Weinstein's Federal Evidence* § 803.06[5] (2d ed.2011).

On the one hand, the declarant has such an interest when describing the force that caused the injury. *See, e.g., Thomas v. State,* 288 Ga.App. 602, 654 S.E.2d 682, 687 (2007) ("[t]he same guarantee of trustworthiness" "also extends to statements as to causation") (internal quotation omitted); *United States v. Joe,* 8 F.3d 1488, 1494 (10th Cir.1993) (the "guaranty of trustworthiness extends to

statements of causation," citing comment to Fed.R.Evid. 803(4)).

On the other hand, the declarant has no such interest when casting blame. *See, e.g., People v. Kosters,* 175 Mich.App. 748, 765, 438 N.W.2d 651, 659 (1989) ("statements fixing fault are not generally motivated by the purpose of obtaining medical treatment"); *Carton v. Missouri Pac. R.R. Co.,* 303 Ark. 568, 575, 798 S.W.2d 674, 677 (1990) ("plaintiff's statement that her foot slipped and she fell was admissible, but not that she had 'apparently accumulated some diesel fuel on her sole,'" explaining "the patient had no motivation to be truthful in the [latter] statement because she knew that it would not matter in her treatment whether she had snow or diesel fuel on her boot").

Further, "cause" has been interpreted broadly, and "fault" narrowly. The court in *United States v. Belfast,* 611 F.3d 783, 819 (11th Cir.2010), upheld refusal to redact references to "abuse" and "torture" from a patient's medical record, explaining:

> The statements by the medical professionals in this case that the victims' wounds and burns were the result of abuse or torture (as opposed to, for example, a vehicular or workplace accident) were statements of causation. *See United States v. Iron Thunder,* 714 F.2d 765, 772–73 (8th Cir.1983) (holding that a statement that a victim was "raped" in her medical records was a statement as to causation, not fault). These records do not assign any fault for the abuse or torture, nor do they insinuate impermissibly that the "abuse" or "torture" satisfied any particular statutory or legal definition of those terms.

The comment to Fed.R.Evid. 803(4) offers as an example, "Thus a patient's statement that he was struck by an automobile would qualify but not his statement that the car was driven through a red light." Numerous cases have cited this example with approval. *See, e.g., Belfast,* 611 F.3d at 819.[2]

Ms. Hurd's alleged reference to plaintiff's recent cocaine use did not attribute fault to plaintiff for his actions. Nor did she have

---

**2.** *See, e.g., People v. Veren,* 140 P.3d 131, 136 (Colo.App.2005) (looking at source materials underlying amendment to Fed.R.Evid. 701 to interpret identical amendment to CRE 701).

any incentive to exculpate defendants by blaming plaintiff for the catastrophic outcome of a routine procedure. Applying the example from the federal rule comment, her statement was one of causation ("I was hit by a car"), not of blame ("because the car ran a red light").

The majority does not support its conclusion that Ms. Hurd sought to assign fault with any evidence that Ms. Hurd was motivated to start the blame game. To the contrary, as the majority recognizes in discussing the evidentiary ruling on litigiousness, "guardian established that plaintiff's family was not contemplating bringing a lawsuit immediately after he was injured." Nothing in the record indicates that Ms. Hurd had a different agenda.

The majority's reliance on *Clark v. People*, 103 Colo. 371, 373, 86 P.2d 257, 259 (1939), for an expansive view of fault is unpersuasive, for the following reasons:

- First, *Clark* predates adoption of the Colorado Rules of Evidence by almost four decades.

- It involved a statement identifying the allegedly culpable actor, (a physician accused of having performed an unlawful abortion), not a neutral cause.

- Recent Colorado cases have admitted similar inculpatory statements. *See People v. Oldsen*, 697 P.2d 787, 788 (Colo. App.1984) (statement of a child sexual assault victim identifying her father as perpetrator), *aff'd on other grounds*, 732 P.2d 1132 (Colo.1986), *superseded in part by statute as stated in People v. District Court*, 791 P.2d 682, 685 n. 3 (Colo.1990); *People v. Martinez*, 18 P.3d 831, 835–36 (Colo.App.2000) (victim's statement identifying defendant as perpetrator made in response to paramedic's question).

- The *Oldsen* court did not cite *Clark*. Nor did the division in *Martinez*.

Nor do the out-of-state cases cited by the majority persuade me to apply the fault exception here. *Brown v. Seaboard Airline R.R. Co.*, 434 F.2d 1101, 1103–04 (5th Cir. 1970), was not decided under Fed.R.Evid.

803(4), and the excluded statement—that a projection from the train hit the plaintiff—ascribes fault to the railroad. Likewise, in *State v. Gattis*, 166 N.C.App. 1, 601 S.E.2d 205, 211 (2004), the patient's statement about his gunshot wound having resulted from an accidental discharge involved fault—or lack thereof. Further, unlike the information on past symptoms provided by Ms. Hurd, the statements in these two cases do not include *any* medically useful information.

Under the "responsibility" heading, the majority briefly raises two other potentially limiting principles on CRE 803(4): "[t]he statements had no relevance to medical treatment plaintiff would receive"; and "[Dr.] Kelly did nothing with the cocaine use information." I address them separately.

### 1. Prospective Application

The plain language of the rule encompasses old information ("medical history, or past ... symptoms"). While many statements made by or about a patient could deal with the patient's present symptoms, any such limitation would exclude statements that contain medically useful information about past symptoms, including those that may be in remission. But such statements could equally assist in obtaining either an accurate diagnosis or efficacious treatment, which are the touchstones for the circumstantial guarantee of reliability.

The plain language of the rule does not suggest a rigid "prospective application" restriction. In the sense that treatment follows diagnosis, treatment is prospective. Diagnosis, however, constitutes "the determination of the nature of a disease, injury, or congenital defect," and is thus distinct from treatment, nor does it require the potential for treatment to exist. *Stedman's Medical Dictionary* 531 (28th ed. 2006). Use of the disjunctive ("diagnosis *or* treatment") means that the exception applies even where treatment is not an option. *People v. Valenzuela*, 216 P.3d 588, 592 (Colo. 2009) (use of the disjunctive "or" demarks different categories).[3]

---

**3.** *See* L. Perrin, *Expert Witness Under Rules 703 and 803(4) of the Federal Rules of Evidence; Sep-*

*arating the Wheat from the Chaff*, 72 Ind. L.J. 939, 947 (1997) ("[T]he rules' most dramatic

Cases cited by the majority to support a prospective application limitation merely reject statements of victims identifying the perpetrators of crimes as not pertinent to diagnosis or treatment. *See, e.g., Hinnant*, 523 S.E.2d at 670 (victim no longer needed medical treatment when she later made statement identifying perpetrator); *State v. Waddell*, 351 N.C. 413, 527 S.E.2d 644 (2000) (similar).[4]

Thus, the references in these cases to the passage of time between the victim first receiving medical treatment and later making the hearsay accusations at issue do not represent a rationale, or at least not one applicable here. First, if such accusations have no significance for diagnosis or treatment, then when the accusations were made is irrelevant to the admissibility calculus. But Ms. Hurd's statement could have contributed to a more complete diagnosis. Second, because the diagnoses of sexual assault were both complete and certain upon the victim's first presentation to a physician, subsequent information—especially that identifying the assailant—afforded no medical reason to look backwards. Here, in contrast, the inability to resuscitate plaintiff more quickly was unexplained despite the diagnosis of brain injury, and recent cocaine use provided a possible explanation that could bring closure to the diagnostic process.

### 2. Use of the Information by Dr. Kelly

The majority says, "[t]hat [Dr.] Kelly did nothing with the cocaine use information allegedly relayed to him by Hurd is telling." I agree that he did not chart, much less use, this information. I disagree that his inaction has any significance because the rule does not require that the physician to whom the

statement was made *actually* rely on it, but only that it be the kind of statement "reasonably pertinent to diagnosis or treatment." [5]

The majority relies on language in *Allee* that the hearsay statement was inadmissible because the physician had not relied on it. *See People v. Allee*, 77 P.3d 831, 834–35 (Colo.App.2003). However, the division first observed that the record did not "indicate that the identification of defendant as the victim's assailant was necessary for or pertinent to the physician's diagnosis or treatment," *id.* at 834, and it cited no authority for the latter statement, *see id.* Further, one division of the court of appeals is not bound by the decision of another division. *See, e.g., Am. Family Mut. Ins. Co. v. Murakami*, 169 P.3d 192, 193 (Colo.App.2007).

More problematic is the majority's reference to the statement in *King v. People*, 785 P.2d 596, 602 (Colo.1990), that CRE 803(4) "requires as a foundation for admission that the proponent establish that statements made to a nontreating psychiatrist be reasonably pertinent to diagnosis and be relied upon by the psychiatrist in arriving at an expert opinion." I do not read *King* as establishing an absolute actual reliance requirement for the following reasons.

- Because the psychiatrist in *King* relied on the hearsay statement, the court did not decide whether lack of such reliance would alone preclude admission under CRE 803(4). The majority cites no Colorado Supreme Court case, nor am I aware of one, answering this question.

- The test in CRE 803(4)—"as reasonably pertinent to diagnosis or treatment"—could be satisfied by testimony concerning what physicians normally do with

---

expansion is the inclusion of statements made for purposes of medical diagnosis alone.... [T]he rule suggests that treatment and diagnosis are independent bases for admission. A statement made solely for purposes of diagnosis, if reasonably pertinent for that purpose, should satisfy the rule, regardless of whether the patient was motivated to obtain treatment at the time.").

4. I question the majority's extensive reliance on North Carolina precedent, in light of the *Hinnant* court's reaffirming "our adherence to the common law rationale underlying the rule," while acknowledging "the current trend of expanding

the ... medical diagnosis exception." 523 S.E.2d at 669.

5. *See* R. Mostellar, *Child Sexual Abuse and Statements for the Purpose of Medical Diagnosis or Treatment*, 67 N.C. L.Rev. 257, 267 (1989) ("Trustworthiness exists separately from whether the statement is used by the auditor, who need not be an expert, and the jury should properly hear it because of that trustworthiness regardless of whether the auditor testifies and gives an opinion based on the statement.").

such information. *See* 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 8:75, at 664 (3d ed.2007) ("these words set a standard that is objective"); Weinstein, *Weinstein's Federal Evidence* § 803.06[2] ("To be admissible, a statement made for purposes of medical diagnosis must be one that an expert in the field would be justified in relying upon in rendering an opinion."); *see also, e.g., State v. Sickles,* 655 A.2d 1254, 1257 (Me.1995) (explaining, under provision identical to CRE 803(4), that the "reasonably pertinent to diagnosis or treatment" requirement "is an objective consideration" (internal quotation marks and citations omitted)).

- The *King* court did not cite any authority reading an actual reliance requirement into the rule. In a footnote, however, the court cross-referenced the language in CRE 703 "of a type reasonably relied upon by experts in the particular field." *King,* 785 P.2d at 602 n. 6. This requirement is not satisfied with actual reliance by the testifying expert. *See, e.g., TK–7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 733 (10th Cir.1993) (concluding under identical federal rule that expert's testimony was improper because based on information not relied on by experts in the field, citing Weinstein, *Weinstein's Federal Evidence* § 703[03] ("The rule implicitly requires that the information be viewed as reliable by some independent, objective standard beyond the opinion of the individual witness.")).

- Whether the physician acts on statements made to him does not affect the underlying theory—the patient, or the patient's representative, has a strong incentive to be truthful. Weinstein, *Weinstein's Federal Evidence* § 803.06[1].

- An actual reliance requirement would raise the question whether non-reliance was reasonable. Efforts by the hearsay proponent to show that it was not could produce confusion and delay. *See* CRE 403. Such efforts could also prejudice the physician, if—as here—his conduct was already at issue for an omission predating the hearsay statement.

According, I reject the fault rationale as a basis for excluding Ms. Hurd's statements from the exception in CRE 803(4).

### F. Reasonably Pertinent to Diagnosis or Treatment

According to the majority, "Given plaintiff's vegetative state when Hurd disclosed the information about his alleged past cocaine use in the 1990s, it is not reasonable to conclude that the information was necessary to diagnose or treat him in mid-December of 2004." However, the statements at issue involve plaintiff's alleged cocaine use on the eve of the needle biopsy.

The majority also says, "At that late stage, the information had no diagnostic value...." But the majority cites no authority, nor have I found any, treating the diagnostic process as so static. *Cf. Brown v. Liberty Mut. Ins. Co.,* 774 A.2d 232, 242 n. 29 (Del.2001) (rejecting argument that statement should be excluded because it "did not actually change the course of treatment": "Rule 803(4) does not require that the medical record actually affect the course of treatment").

Where an initial diagnosis leaves significant questions unanswered, additional information may afford a basis for looking backwards. And even if the diagnostic process has concluded, the patient may seek a second opinion. *See United States v. Rodriguez–Rivera,* 63 M.J. 372, 381 (C.A.A.F.2006) (applying exception to statements made to physician providing second opinion on cause of injuries).

In either setting, the hearsay declarant has a motive to provide accurate information. Here, as indicated, when Ms. Hurd spoke to Dr. Kelly, no one knew of any medical reason why plaintiff could not have been resuscitated more quickly. Ms. Hurd's words indicate that she was offering information from which Dr. Kelly might provide an answer. She had no reason to provide inaccurate or self-serving information.

The majority also references "[t]he timing of Hurd's post-injury statements" and the lack of "information that is reasonably relied on by a physician." Both subjects have been addressed above.

Finally, the majority states that Ms. Hurd's "motive for making the statements in mid-December of 2004 was not to promote [plaintiff's] diagnosis or treatment," citing her trial testimony. This case is anomalous, however, because at the second trial Ms. Hurd denied having made the statements attributed to her by Dr. Kelly. The jury was free to believe that she had not made them. But her denial was not before the trial court when the first judge held the statements admissible.

Rather, in divining Ms. Hurd's intent, that judge had to rely on the content of the statements and their context. *See* 4 Mueller & Kirkpatrick, § 8:75, at 664 (noting that, although determining motive under 803(4) is a matter of "the subjective understanding" of the declarant, in practice courts are "not in a good position to figure out what the speaker was actually thinking, so the standard means taking into account what a reasonable person in the position of the [declarant] would likely think"). And because she denied having made the statements, I would not reevaluate admissibility based on her testimony during the second trial.[6] *See Wheat v. United States,* 486 U.S. 153, 162, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) (observing that trial court must decide issues "not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context").

Her alleged statements, as recounted by Dr. Kelly, provided specific and recent information about plaintiff, in a medical setting, to one of his physicians.[7] Neither the content nor the context of these statements is comparable to cases cited by the majority. *See, e.g., Waddell,* 351 N.C. at 418, 527 S.E.2d at 648 (child sexual assault victim made statements identifying her assailant in a "nonmedical environment" without any indication of a "medical treatment motivation on the part of the child.");[8] *United States v. Narciso,* 446 F.Supp. 252, 289 (E.D.Mich.1977) ("it is not clear that Dr. Goodenday communicated to [the declarant] that she wanted to know who had administered the injection to find out what the medication was").

Nor would I fault the later trial judges, as the majority implies, for not revisiting the ruling. Because Ms. Hurd denied having made the statements at issue, her explanation of her intent applied only to the statements that she admitted having made. Thus, these judges, like the first judge, had no metric for gauging her intent behind the statements she denied other than their content and context. Neither had changed since the initial ruling.

In sum, I cannot say that the trial court abused its discretion in admitting the hearsay statements attributed to Ms. Hurd by Dr. Kelly. On the particular facts presented, the fault exception does not divest the trial court of its customary discretion in such evidentiary rulings. Rather, this determination must be made "in light of the facts of the particular case." Weinstein, *Weinstein's Federal Evidence* § 803.03[6].

The content and context of the statements that Dr. Kelly attributed to Ms. Hurd are consistent with her desire to provide information that could lead to discovery of the medical cause why plaintiff was not resuscitated more quickly. Although the permanence of plaintiff's brain injury when Ms. Hurd allegedly spoke would permit a different inference, because the record provides some support for the trial court's discretionary determination, it should stand. *See, e.g., Bainbridge, Inc. v. Bd. of Cnty. Comm'rs,* 53 P.3d 646, 649 (Colo.App.2001).

## II. Prejudice and Probative Value

I also reject guardian's assertion that even if the hearsay statements satisfied a hearsay exception, they were highly prejudicial and

---

**6.** This is especially so because guardian failed to request the third judge to reconsider the ruling, based on Ms. Hurd's trial testimony, before Dr. Kelly testified.

**7.** On appeal, guardian argues that Dr. Kelly was no longer treating plaintiff. Because guardian failed to argue below that this fact was known to Ms. Hurd, I do not consider it as relevant to her intent. *See, e.g., Am. Family Mut. Ins. Co. v. DeWitt,* 216 P.3d 60, 65 (Colo.App.2008), *aff'd,* 218 P.3d 318 (Colo.2009).

**8.** The *Waddell* court described these factors as "essentially identical to those in *Hinnant.*" 351 N.C. at 418, 527 S.E.2d at 648.

confusing to the jury, and therefore should have been excluded under CRE 403.

Under CRE 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice [or] confusion of the issues." However, the rule "strongly favors the admission of relevant evidence." *People v. Greenlee,* 200 P.3d 363, 367 (Colo.2009). "When reviewing a trial court's admission of evidence in light of the balancing test of CRE 403, an appellate court must assign to the evidence the maximum probative value and the minimum unfair prejudice which a reasonable fact finder might attribute thereto." *People v. Welsh,* 80 P.3d 296, 304 (Colo.2003). In a close case, "the balance should be struck in favor of admitting probative evidence." *Vialpando v. People,* 727 P.2d 1090, 1095–96 (Colo.1986).

Here, I agree with defendants that these statements provided a possible explanation for plaintiff's injury, which they supported with expert testimony that "cocaine abuse ... caused [plaintiff's injurious] outcome." Thus, although admission of Ms. Hurd's statements was detrimental to guardian's case, in my view the trial court did not abuse its discretion in deciding that their probative value was not substantially outweighed by the danger of unfair prejudice or confusion of the issues. *See, e.g., Phillips,* 244 F.3d at 800 (affirming admission of prior drug use evidence over rule 403 objection and noting that "[w]hile plaintiffs would have preferred evidence of [patient's] drug use not be presented to the jury, simple prejudice alone is insufficient to warrant exclusion").

### III. Alternate Juror Issue

I address the alternate juror issue because it represents a separate ground for reversal and is a question of first impression in Colorado.

Guardian contends the judgment should be reversed because, by refusing to seat any alternates unless the parties agreed that they could deliberate, the trial court forced him to agree to have the two alternate jurors deliberate. I discern no abuse of the trial court's discretion over seating alternates, and therefore no coercion voiding guardian's agree-

ment. Thus, deliberation by the alternates affords no ground for reversal.

In civil cases, trial before a six-member jury is a matter of right. C.R.C.P. 48. However, the trial court "may call and impanel alternate jurors." § 13–71–142, C.R.S. 2011; *see* C.R.C.P. 47(b). And, "[i]f the court *and the parties* agree, alternate jurors may deliberate and participate fully with the principal jurors in considering and returning a verdict." C.R.C.P. 47(b) (emphasis added).

Impaneling alternate jurors is a matter of grace subject to trial court discretion, not a privilege. *See, e.g., Larry H. Miller Corp.-Denver v. Urban Drainage & Flood Control Dist.,* 64 P.3d 941, 946 (Colo.App.2003) ("the General Assembly's use of the term 'may' is indicative of a discretionary power to choose among alternatives"); *see also* 12 Colo. Prac., Civil Procedure Forms & Commentary § 47.10 (2d ed.) ("it is within the sole province of the trial court to call alternate jurors"); *State v. Miller,* 259 Kan. 478, 912 P.2d 722, 727 (1996) ("The selection of additional or alternate jurors lies within the sound discretion of the trial court.").

Guardian cites no authority, nor am I aware of any in Colorado, holding that a trial court's decision whether to impanel alternate jurors can be challenged as an abuse of discretion. I need not decide whether this discretion is absolute because here the record affords a basis for the court's decision. *See, e.g., Pham v. State Farm Mut. Auto. Ins. Co.,* 70 P.3d 567, 572 (Colo.App.2003) (in determining that there was no just reason for delay in entering final judgment on a claim, trial court did not abuse its discretion because it considered "the interests of judicial administration and the equities involved").

This case was tried twice. During the first trial, a mistrial occurred when the court excused several jurors and guardian refused to proceed with fewer than six jurors. On retrial before a different judge, the court told the parties in advance of jury selection, "I'm not going to sit alternate jurors if you guys aren't going to let them deliberate, not for four weeks. That's cruel ... that's four weeks of inconvenience, severe inconvenience...." Guardian's counsel replied:

"[O]ur position [is] that under the rule we're not required to agree that alternates deliberate ... [however,] in light of what the court· has stated, that if we will not agree to that, there will be no alternate jurors, we feel we have no option but to agree with the Court's request in that regard...." In response to the court's question, counsel for Dr. Kelly responded, "We would agree to them deliberating," and Dr. Waintrub's counsel did not reply.

Thereafter, however, defendants filed a joint trial brief stating that "the Court's decision to allow the alternate jurors to deliberate may be deemed a reversible error if Plaintiff later argues that their [sic] agreement was not entirely voluntary." They asked the court to "reconsider its ruling" and asserted that, "if Plaintiff will not clearly and unconditionally agree to having the alternates deliberate, Defendants also withdraw their previous preliminary agreement to allow alternates to deliberate."

At a hearing shortly after defendants filed this brief, the trial court explained,

> [M]y practice is, and always has been, particularly for a trial of this length, if you're going to have alternate jurors, the alternates deserve to deliberate. And if the parties either don't want to agree to that, or cannot ... get their clients to agree to that ... that's their prerogative, but then you go back to six.

The court confirmed guardian's position: "[I]f they [guardian and counsel] had their druthers, they'd not have the alternates deliberate. But they weighted [sic] that against the idea of going with six ... and that cost-benefit analysis ... led to their decision to accept the alternates deliberating." Guardian's counsel replied, "I think that's a fair statement, Your Honor." The following day, the court reconfirmed that position with guardian's counsel.

Initially, I reject guardian's argument that because of assertions in defendants' trial brief, they are judicially estopped from arguing that the trial court's decision should be affirmed. Judicial estoppel is "an equitable doctrine by which courts require parties to maintain a consistency of positions in the proceedings, assuring promotion of truth and preventing the parties from deliberately shifting positions to suit the exigencies of the moment." *Estate of Burford v. Burford,* 935 P.2d 943, 947 (Colo.1997). But here, the position defendants maintain on appeal—all parties agreed with having the alternate jurors deliberate—is the same position that they first took below. To the extent that their trial brief deviated from this position, it was not "totally inconsistent" with their initial position, *see id.* at 948, as it merely suggested that the court's decision "*may* be deemed a reversible error." *Id.* (emphasis added). And the court maintained its ruling that any alternates would be allowed to deliberate. *See Lyons Sav. & Loan Ass'n v. Dire's Lock & Key Co.,* 885 P.2d 345, 349 (Colo.App.1994) (noting requirement that "the party against whom estoppel is sought must have successfully asserted the contradictory position in the earlier proceeding").

Next, I conclude that the trial court did not abuse its discretion in seating alternates only if they could deliberate because it articulated reasons based on sound judicial administration that are supported by the record. *See, e.g., Pham,* 70 P.3d at 572. The court explained that because a four-week trial was difficult to schedule and posed "a tremendous hardship" for the jurors, it had to balance the parties' right to a fair trial "with the interests of the community" and the court's "administrative obligations ... to the public at large in managing [its] dockets."[9]

Because guardian had no right to any alternates, the condition that alternates deliberate did not destroy the voluntariness of his agreement. Although acquiescence in the deliberation condition waived guardian's right to a jury of six, a party may be re-

---

9. The court's decision is also consistent with the practice of federal courts, which require alternates to deliberate unless, like the principal jurors, they have been excused for good cause. Fed.R.Civ.P. 48(a) ("A jury must begin with at least 6 and no more than 12 members, and each juror must participate in the verdict unless excused [for good cause] under Rule 47(c)."); Fed. R.Civ.P. 48 Advisory Committee Notes, 1991 Amendment ("The use of jurors in excess of six increases the representativeness of the jury and harms no interest of a party.").

quired to waive a right to obtain a discretionary benefit. *See, e.g., Shea v. Hanna Mining Co.,* 397 N.W.2d 362, 370 (Minn.Ct.App. 1986) ("In this case, waivers of jury trials on the fraud claims were meant to alleviate any delay or prejudice which might result from amendment of the pleadings at such a late stage in the proceedings. It was clearly within the discretion of the trial court to impose such conditions upon appellants' ability to assert these new claims."); *cf. Gray v. State Farm Mut. Auto. Ins. Co.,* 826 P.2d 420, 421 (Colo.App.1992) (concluding that "the trial court did not abuse its discretion in conditioning its order granting plaintiff's request for a continuance upon her and her counsel's payment of those attorney fees incurred by defendant in preparing for the trial that was continued").

Therefore, because guardian could have chosen to forego impaneling any alternates, thereby preserving his right to a jury of six, his agreement that the alternates deliberate was not forced or illusory. *See Smith v. Gulf Oil Co.,* 995 F.2d 638, 644–45 (6th Cir.1993) (concluding that, although the court "in rather harsh terms" asked the parties to stipulate to having four alternate jurors "audit[ ] the deliberations" or else "do away with consolidated trials for the remaining [plaintiffs,]" the agreement was not "obtained through coercion," and therefore "plaintiffs validly stipulated to [it]"). For this reason, the cases that guardian relies on, which hinge on the appellant not having agreed to allow the alternates to deliberate, are inapposite. *See Kuykendall v. Southern Railway Co.,* 652 F.2d 391, 393 (4th Cir.1981); *Cabral v. Sullivan,* 961 F.2d 998, 1000 (1st Cir.1992); *Jones v. Sisters of Providence in Washington, Inc.,* 140 Wash.2d 112, 994 P.2d 838, 840 (2000); *see also Todd v. Bear Valley Vill. Apartments,* 980 P.2d 973, 980 (Colo.1999) (appellant "was not offered a choice of accepting a continuance according to certain conditions").[10]

## IV. Other Issues

Guardian's remaining contentions for reversal based on other evidentiary rulings are without merit.

10. Because I conclude that plaintiff voluntarily agreed to allow the alternate jurors to deliberate,

Accordingly, I would affirm the judgment for defendants entered on the jury's verdict in their favor.

2014 COA 8M

I do not reach defendants' contention that any error was harmless.