2014 CO 46

**Jason L. KELLY, M.D. and Mauricio L. Waintrub, M.D., Petitioners**

**v.**

**Vasilios HARALAMPOPOULOS, BY his guardian John HARALAMPOPOULOS, Respondent.**

**Supreme Court Case No. 11SC889**

Supreme Court of Colorado.

June 16, 2014

Attorneys for Petitioner Jason L. Kelly, M.D.: Kay J. Rice, Beth N. Nesis, Cooper & Clough, PC, Denver, Colorado, Andrew M. Low, Shannon Wells Stevenson, John M. Bowlin, Kyle Wesley Brenton, Davis Graham & Stubbs LLP, Denver, Colorado.

Attorney for Petitioner Mauricio L. Waintrub, M.D.: David H. Yun, Jaudon & Avery LLP, Denver, Colorado.

Attorneys for Respondent Vasilios Haralampopoulos, by his guardian John Haralampopoulos: Teresa D. Locke, Keeya Marie Jeffrey, Holland & Hart LLP, Denver, Colorado.

Attorneys for Amicus Curiae American Medical Association, Colorado Chapter of the American College of Emergency Physicians, Colorado Medical Society, Colorado Radiological Society, and Colorado Society of Anesthesiologists: Kari Mackercher Hershey, Hershey Decker, LLC, Littleton, Colorado

and John L. Conklin, Jerome R. Geraghty, Martin Conklin, P.C., Denver, Colorado.

Attorney for Amicus Curiae Colorado Defense Lawyers Association: Troy Robert Rackham, Maureen R. Weiland, Fennemore Craig, PC, Denver, Colorado.

Attorney for Amicus Curiae Regents of the University of Colorado: Patrick Terrence O'Rourke, Office of University Counsel, Denver, Colorado.

JUSTICE EID delivered the Opinion of the Court.

¶ 1 Respondent Vasilios Haralampopoulos visited the emergency room with severe abdominal pain. After a CT scan revealed a large cystic mass in his liver, Petitioner Dr. Mauricio Waintrub examined Respondent, gave a differential diagnosis identifying four possible causes for his condition, and approved a fine-needle biopsy to determine the nature of the cyst. Petitioner Dr. Jason Kelly performed the procedure, during which Respondent suffered respiratory and cardiac arrest. Normal resuscitation efforts were unsuccessful, and it took over 30 minutes to revive Respondent's heart. Lack of oxygen to his brain left Respondent in a vegetative state.

¶ 2 Ten days later, Respondent's family and friends met with doctors to determine why Respondent went into arrest and had such a poor reaction to resuscitation efforts. After the meeting, Respondent's then-roommate and ex-girlfriend Gulsans Akyol Hurd approached Dr. Kelly and asked him whether Respondent's prior cocaine use could have contributed to his injuries. Dr. Kelly responded that cocaine could have contributed to Respondent's resistance to normal resuscitation efforts, but he was not a cardiologist so he did not know.

¶ 3 Respondent brought a medical malpractice suit against seven individuals, including Petitioners Dr. Kelly and Dr. Waintrub. Respondent filed a motion in limine seeking to exclude Hurd's statements to Dr. Kelly as inadmissible hearsay not covered by any hearsay exception. In particular, Respondent argued that the statements did not qualify under Colorado Rule of Evidence 803(4), which creates a hearsay exception for statements "made for purposes of medical diagnosis or treatment." Further, Respondent argued that because Hurd's statements were inadmissible, any additional testimony regarding cocaine use was inadmissible as irrelevant. The trial court denied the motion in limine, finding that Hurd's statements were made for purposes of diagnosis and treatment under Rule 803(4), and that their probative value was not substantially outweighed by the danger of unfair prejudice under Colorado Rule of Evidence 403.

¶ 4 The court of appeals reversed, finding that the trial court abused its discretion by admitting evidence of Respondent's cocaine use. *Haralampopoulos ex rel. Haralampopoulos v. Kelly,* 2011 WL 4908743 at *6, —— P.3d ——, —— (Colo.App.2011). The court held that Hurd's statements to Dr. Kelly were not admissible under Rule 803(4) because of the Rule's "prospective" focus. *Id.* The court reasoned that because the statements were made after Respondent was in a vegetative state and treatment was no longer possible, they were not made for the purpose of diagnosis or treatment. *Id.* at *6–7, ——. The court of appeals further held that, even if the statements were admissible under Rule 803(4), the trial court abused its discretion in finding that their probative value was not substantially outweighed by the danger of unfair prejudice under Rule 403. Because Hurd's statements were inadmissible, the court of appeals reasoned, so was any lay or expert testimony on cocaine use. *Id.* at *9, ——. Judge Webb dissented, concluding that Rule 803(4) did not contain a prospective limitation. *Id.* at *23, —— (Webb, J., dissenting).

¶ 5 We now reverse. The court of appeals erred in limiting the scope of Rule 803(4) to statements made for the purpose of prospective treatment. The Rule's plain language applies to "diagnosis *or* treatment," and while the term "treatment" has a prospective focus, the term "diagnosis" does not. Instead, diagnosis focuses on the cause of a patient's medical condition, and may or may not involve subsequent treatment. Here, Hurd's statements were made for the pur-

pose of discovering the cause of Respondent's resistance to normal resuscitation efforts, and were thus admissible under Rule 803(4). We also conclude that the trial court did not abuse its discretion in finding that the statements' probative value was not substantially outweighed by the danger of unfair prejudice under Rule 403. Finally, we conclude that, given the admissibility of Hurd's statements, the trial court did not err in admitting additional lay and expert testimony regarding Respondent's prior cocaine use. Accordingly, we reverse the court of appeals' decision, and remand the case to the trial court to enter a judgment in Petitioners' favor.

## I.

¶ 6 On November 23, 2004, Respondent visited the emergency room complaining of severe abdominal pain. During his intake, Respondent denied any drug use. A CT scan of Respondent's liver revealed a large cystic mass. The on-call surgeon recommended a fine-needle aspiration biopsy. Dr. Waintrub, an internal medicine specialist, examined Respondent and issued a differential diagnosis identifying possible causes for Respondent's cyst: hydatid cyst, amoebiasis, abscess, or cancer. To determine the cause of Respondent's condition, Dr. Waintrub approved the aspiration. The next day, Dr. Kelly, an interventional radiologist, performed the aspiration. During the procedure, Respondent went into respiratory arrest, and then cardiac arrest. Respondent did not react to normal resuscitation efforts, and it took over 30 minutes to revive his heart. Lack of oxygen to his brain caused a brain injury, and Respondent is now in a vegetative state. Subsequent tests revealed that the cyst was a hydatid cyst.[1] During the aspiration, toxic material from the cyst flowed out of the needle and caused respiratory and cardiac arrest.

¶ 7 On December 3, 2004, Dr. Kelly and other doctors met with Respondent's sisters, his mother, an attorney, and his ex-girlfriend

and then-roommate Gulsans Akyol Hurd ("Hurd") because they wanted to know what caused Respondent's injuries. Before the meeting and outside the doctors' presence, Hurd asked the family whether Respondent's past cocaine use could have had anything to do with his failure to respond to resuscitation. No one mentioned Hurd's question or Respondent's past cocaine use at the meeting with the doctors.

¶ 8 About two weeks after the aspiration, Hurd approached Dr. Kelly privately and asked him whether cocaine use could have contributed to Respondent's injures. Hurd testified at trial that she asked Dr. Kelly this question because "we were all searching for answers ... I was asking these questions because nobody had answers for me, and so therefore I kept questioning and questioning hoping to find an answer." Hurd testified that she told Dr. Kelly,

[Respondent] used to do drugs in the past, he used to do a little cocaine, and, you know, could it have been in his system and could it have interacted with the anesthesia or could it have sent him into cardiac arrest or—you know, I was—I don't know if I was asking it right, but I was searching for some kind of answer or reason why this happened.

¶ 9 Dr. Kelly testified that in addition to asking whether Respondent's cocaine use could have contributed to his injuries, Hurd told him that

[Respondent] was a recreational cocaine user and that that had been an issue in their relationship, and that in the days around his first emergency room visit,[2] he had been using a significant amount of cocaine because of the pain; and he didn't feel that the physicians at the hospital after his first visit had given him enough pain medicine.

Dr. Kelly told Hurd that cocaine use could have contributed to the cardiac arrest, but he was not an expert on cocaine or cardiology, so he did not know. Dr. Kelly asked Hurd whether she knew that Respondent had been

1. A hydatid cyst is a mass in the body which grows as a result of a parasitic infestation caused by a tapeworm. *Stedman's Medical Dictionary* 480–81 (28th ed.2006).

2. Respondent's first emergency room visit was on November 21, 2004.

using cocaine, and she said, "I was not here when he got admitted to the hospital." Dr. Kelly did not note Hurd's comments on Respondent's chart or otherwise inform medical personnel. He stated that he did not do so because, "I didn't really see what good it would do . . . at that point it didn't seem to matter."

¶ 10 Respondent, through his brother and guardian John Haralampopoulos ("John"), brought a medical malpractice action against seven individuals, including Dr. Kelly and Dr. Waintrub. Before trial, Respondent filed a motion in limine, arguing that Hurd's statements to Dr. Kelly were hearsay that did not fall within any exception, including Rule 803(4). Respondent also argued that, because Hurd's statements were inadmissible, any lay or expert testimony regarding Respondent's cocaine use and the possible health effects of cocaine use should be excluded as irrelevant. Finally, Respondent offered that even if Hurd's statements to Dr. Kelly qualified under a hearsay exception, they were inadmissible under Rule 403 because their probative value was substantially outweighed by the danger of unfair prejudice.

¶ 11 The trial court denied the motion in limine, reasoning that Hurd's statements were made for the purpose of medical diagnosis or treatment under Rule 803(4), that they were also admissible under the residual hearsay exception contained in Colorado Rule of Evidence 803(24) (now Rule 807), and that their probative value was not substantially outweighed by the danger of unfair prejudice. Specifically, the court stated:

> [Hurd's statements to Dr. Kelly are] really the key to this case . . . the probative value of those statements is imperative to the defense presentation of the case, but all of the issues brought up by [Respondent] in the motion . . . are suitable for cross-examination and also for ultimate argument. But to—I think it is under the hearsay exception for purposes of medical diagnosis. Doctors every day rely on statements made to them not just by the patient, but also family members, in making treatment decisions . . .

> Furthermore, under the residual hearsay (sic), I find that it's also appropriate under that hearsay exception. Under [Rule] 403, it is intensely probative in the case, and which it is also intensely prejudicial to [Respondent] in this case, on balance I think that it is appropriate to permit that information in.

¶ 12 After an unrelated mistrial, Respondent filed a second motion in limine requesting re-examination of the previous ruling because, according to Respondent, Petitioners had admitted that Dr. Kelly was not one of Respondent's treating physicians when he spoke to Hurd, and because Hurd, who was not deposed, submitted an affidavit disagreeing with Dr. Kelly's testimony and asserting that although she mentioned Respondent's past cocaine use to Dr. Kelly, she did not state that he used cocaine recently. The trial court refused to revisit the issue.

¶ 13 At trial, Petitioners introduced evidence to support the theory that Respondent's resistance to normal resuscitation efforts was caused by recent or chronic cocaine use. Respondent's brother John testified that between 1990 and 1995, he became concerned that his brother was abusing cocaine, so he confronted him and asked him to stop. John stated that Respondent did not completely stop using cocaine after this confrontation. To John's knowledge, Respondent never attended a drug rehabilitation program. Respondent's sisters were also questioned regarding their knowledge of Respondent's cocaine use, but denied knowledge of such use.

¶ 14 On cross-examination, Hurd testified that Respondent used cocaine in the late 1990s, and that she observed him using cocaine on two occasions. During that time, she approached his family and expressed concern about his drug use. According to Hurd, Respondent continued using these substances after she spoke to the family, and after he assured her that he was going to stop. Hurd also recalled that a few days before he sought medical care, when Respondent was living with her, he told her that he saw a "white puffy cloudlike thing" coming towards him and believed it was Hurd's dead roommate coming to "get" him. When Re-

spondent recounted this experience to her, Hurd asked, "What are you high or something? What are you on drugs or something?" Respondent denied being on drugs.

¶ 15 Petitioners also presented other evidence to show that Respondent may have been a recent or chronic cocaine user. He had financial problems throughout his life, particularly in the 1990s, when Hurd said he used cocaine. Respondent's medical record showed that he had hepatitis C without any record of a blood transfusion from 1992 onwards.

¶ 16 Relying on Hurd's statements to Dr. Kelly and other evidence that Respondent used cocaine, several experts testified regarding the possible effects of cocaine use on health, and the relationship between cocaine use and Respondent's various health issues, including hallucinations and delusions, hepatitis C, cardiac arrhythmia, and cardiomyopathy. For example, Dr. Michael Freeman, a forensic epidemiologist, noted that cocaine use is associated with cardiac arrest or heart attacks. Dr. Gary Salzman, a critical care and pulmonary medicine specialist, opined on whether recent or chronic cocaine use could affect resuscitation efforts, and noted that cocaine has a toxic effect on the heart. Dr. Roger Freedman, a cardiologist, stated that after Respondent's cardiac arrest he had cardiac arrhythmias and death of heart muscle, which can sometimes be caused by cocaine use. Dr. Ken Kulig, a toxicologist, discussed cocaine's addictive nature and its effects on the heart. Dr. Dennis Clifford, a critical care and pulmonary medicine specialist, testified on the effects of cocaine use on the heart, and how residual abnormalities after ceasing cocaine use might make a person resistant to resuscitation after cardiac arrest. Finally, Dr. Eric Zacharias, an internal medicine specialist, testified that cocaine decreases the heart's response to stimulants given to resuscitate a patient.

¶ 17 The jury found in Petitioners' favor. On appeal, the court of appeals reversed, holding that the trial court abused its discretion in admitting any evidence of Respondent's cocaine use and that its admission "derailed" the trial proceedings. *Haralampopoulos ex rel. v. Kelly*, 2011 WL 4908743 at *1, *5–6, —— P.3d ——, —— (Colo.App. 2011). The court concluded that Rule 803(4) "contemplates prospective application" only. *Id.* at *6, ——. Because Respondent had already sustained irreversible brain damage by the time Hurd spoke to Dr. Kelly and could no longer be treated, the court concluded that Hurd's statements to Dr. Kelly could not fall within the terms of Rule 803(4). *Id.* The court also found that Dr. Kelly could not and did not reasonably rely on the information offered, as required under its reading of the Rule. *Id.* at *8, ——. In addition, the court found that none of the statements regarding cocaine use were admissible under the former Rule 803(24) (now Rule 807), the residual hearsay exception. *Id.* at *9, ——. Finally, the court held that Hurd's statements should have been barred under Rule 403, which excludes statements whose danger of unfair prejudice substantially outweighs their probative value, because even the trial court found them to be prejudicial. *Id.* at *11, ——. Because Hurd's statements were inadmissible, the court of appeals reasoned, so was any lay or expert evidence on cocaine use. *Id.* at *5–6, ——. Judge Webb dissented, concluding that Rule 803(4) did not contain a prospective limitation. *Id.* at *23, —— (Webb, J., dissenting).

¶ 18 We granted Petitioners' petition for certiorari,[3] and now reverse. The court of appeals erred in limiting the scope of Rule 803(4) to statements made for the purpose of prospective treatment. The Rule's plain language applies to "diagnosis *or* treatment," and while the term "treatment" has a prospective focus, the term "diagnosis" does not. Instead, diagnosis focuses on the cause of a patient's medical condition, and may or may not involve subsequent treatment. Here, Hurd's statements were made for the purpose of discovering the cause of Respon-

---

**3.** The Court granted certiorari on the following issue: Whether the court of appeals erred in concluding that statements to a physician and other hearsay evidence regarding a patient's alleged cocaine use was inadmissible under the rules of evidence in a medical malpractice case in which the parties disputed the cause of the patient's complications following a medical procedure.

dent's failure to react to normal resuscitation efforts, and were thus admissible under Rule 803(4). In addition, we conclude that the trial court did not abuse its discretion in determining that the statements' probative value was not substantially outweighed by the danger of unfair prejudice under Rule 403. Finally, we conclude that given the admissibility of Hurd's statements, the trial court did not err in admitting additional lay and expert testimony regarding Respondent's prior cocaine use. Accordingly, we reverse the court of appeals' decision, and remand the case to the trial court to enter a judgment in Petitioners' favor.

## II.

¶ 19 Rule 803(4) creates a hearsay exception for:

Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

■ ¶ 20 Rule 803(4) thus provides an exception for statements 1) made for purposes of medical diagnosis or treatment; 2) that describe medical history, symptoms, or the inception or cause of symptoms; 3) insofar as they are reasonably pertinent to diagnosis or treatment. *King v. People,* 785 P.2d 596, 600 (Colo.1990). As the U.S. Supreme Court has said of the analogous federal rule, "a statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility." *White v. Illinois,* 502 U.S. 346, 356, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992).[4] Such a statement carries with it a presumption of reliability. *W.C.L. v. People,* 685 P.2d 176, 181 (Colo.1984), *superseded by statute on other grounds,* 1989 Colo. Sess. Laws 862,

as recognized in *People v. Dist. Court,* 791 P.2d 682, 685 n.3 (Colo.1990).

¶ 21 We first consider the court of appeals' rationale that Hurd's statement could not fall within Rule 803(4) because the rule has only a prospective application. Next, we consider the application of the court of appeals' two-part test for reliability of statements under Rule 803(4). Because these issues require us to interpret the scope of Rule 803(4), our review is de novo. *Bly v. Story,* 241 P.3d 529, 533 (Colo.2010).

### A.

¶ 22 The court of appeals held that Hurd's statements to Dr. Kelly about Respondent's prior cocaine use could not fall within Rule 803(4) because the Rule "contemplates prospective application" only. *Kelly,* 2011 WL 4908743 at *6, —— P.3d at ——. The court of appeals reasoned that because Respondent had already sustained irreversible brain damage by the time the statements were made, it was no longer possible to provide treatment to Respondent at that point, and therefore the statements could not fall within the terms of Rule 803(4). *Id.* at *7, ——. We conclude that the court of appeals' interpretation is erroneous.

■ ¶ 23 The court of appeals' focus on prospectivity ignores the fact that the Rule is written in the disjunctive, applying to "statements made for purposes of medical diagnosis *or* treatment." (Emphasis added). A statement made for purposes of "treatment" suggests that it is made in conjunction with developing a course of action to treat a patient's medical condition. *See Stedman's Medical Dictionary* 2022 (28th ed.2006) (defining treatment as "[m]edical or surgical management of a patient"); *King,* 785 P.2d at 602 (referring to a physician who "prescrib[es] a course of treatment"). The term "treatment" thus contains a prospective connotation.

4. We look to the analogous federal rule for guidance where possible. *King,* 785 P.2d at 600. The federal rule provides: "The following [is] not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: ... A statement that (A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause." Fed.R.Evid. 803(4).

¶ 24 In contrast, the term "diagnosis" does not carry with it a similar prospective limitation, and instead refers to the process of determining the cause of a medical condition. The term "diagnosis" is defined as the process of determining the nature, source, or cause of a medical condition. *See Stedman's Medical Dictionary* 531 (defining diagnosis as "[t]he determination of the nature of a disease, injury or congenital defect"); *Webster's New International Dictionary* 622 (3d ed. 2002) ("1. The art or act of recognizing a disease from its signs and symptoms; also: the decision reached. . . . 3. Investigation or analysis of the cause or nature of a condition, situation, or problem: a statement or conclusion about the nature or cause of a phenomenon."). In practice, doctors give various types of diagnoses, all of which share the goal of determining the cause of a medical condition. But not all diagnoses occur in circumstances where treatment is possible. For example, a clinical diagnosis is "made from a study of the signs and symptoms of a disease." *Stedman's Medical Dictionary* 531. A differential diagnosis is "the determination of which of two or more diseases with similar symptoms is the one from which a patient is suffering." *Id.* Both of these diagnoses could lead to treatment, although they do not require it. By contrast, a pathological diagnosis is "a diagnosis, sometimes post-mortem, made from an anatomic and/or histologic study of the lesions present." *Id.* Treatment is impossible after a post-mortem pathological diagnosis, but medical personnel can undertake the diagnosis to determine the cause of the decedent's medical condition. In sum, a diagnosis may lead to treatment, but not necessarily so. Thus, if a statement is offered for the purpose of determining the nature, source, or cause of a patient's medical condition, it falls within the language of Rule 803(4), regardless of whether it is accompanied by treatment.

¶ 25 We made this point almost twenty-five years ago in *King v. People,* 785 P.2d 596 (Colo.1990). There, the defendant made statements to an expert psychiatrist who was evaluating him solely for the purpose of testifying about his mental condition at trial. *Id.* at 598. The trial court did not allow the expert to testify as to the defendant's mental condition. *Id.* at 599. The court of appeals upheld the trial court and excluded the testimony, holding that the expert was not the defendant's treating physician, but merely an expert who examined the defendant and formed an expert opinion. *Id.* at 599–600. We rejected this argument, noting that: "[t]he plain terms of [Rule] 803(4) speak not only to statements made for purposes of treatment but also of statements made for purposes of diagnosis." *Id.* at 602. We observed that the federal rule, upon which CRE 803(4) is based,[5] was intended "to include within the hearsay exception a party's statement to a nontreating [physician] for purposes of diagnosis in connection with pending litigation." *Id.* We thus held that the statements made by the defendant for the purpose of diagnosis were admissible despite the fact that no treatment was involved. We reaffirmed this holding more recently in *People v. Vigil,* 127 P.3d 916, 927 (Colo.2006), where we stated that the exception recognized by Rule 803(4) "includes a party's statement to a non-treating physician for purposes of diagnosis in connection with pending criminal litigation." We therefore reject the court of appeals' prospectivity rationale and its conclusion that Hurd's state-

5. Before the Colorado Rules of Evidence were enacted, courts allowed statements made to a healthcare provider examining a patient to prepare for litigation, but for the limited purpose of "serving as factual support" for the healthcare provider's expert opinion. *See King,* 785 P.2d at 601. Rule 803(4) eliminated the distinction between statements made to a physician consulted for an ongoing health concern and one consulted in preparation for trial. The Advisory Committee note to Fed.R.Evid. 803(4), identical to Rule 803(4), "rejects the limitation" on admitting statements to physicians consulted in preparation for trial for their truth, noting that a jury would have difficulty considering statements made to testifying experts for their factual support and not for their truth. Fed.R.Evid. 803(4) advisory committee's note. In *King,* this Court recognized that FRE 803(4) "abolish[ed] the distinction between the doctor 'who is consulted for the purpose of treatment' and the doctor who examines a party 'for the purpose of diagnosis only,' even though the latter 'is consulted only in order to testify as a witness.'" *King,* 785 P.2d at 601 (citing *United States v. Iron Shell,* 633 F.2d 77, 83 (8th Cir.1980), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981)).

ments necessarily fall outside the ambit of Rule 803(4) because they were made after treatment was no longer possible.

¶ 26 The question, then, is whether Hurd's statements were for the purpose of determining the nature, source, or cause of Respondent's medical condition. We conclude that they were.

¶ 27 Hurd attended the meeting between Respondent's family and his doctors held about a week after the biopsy was performed.[6] Before that meeting, and outside the presence of the doctors, Hurd raised the issue of Respondent's prior cocaine use as it might relate to his failure to respond to resuscitation efforts. While nothing was said to the doctors about cocaine use during that meeting, a week later Hurd raised the issue privately with Dr. Kelly.

¶ 28 Hurd testified that when she spoke to Dr. Kelly, she was "searching for some kind of answer or reason why this happened." She believed Respondent's past drug use was relevant to determining what happened because she thought cocaine could have "been in his system and . . . interacted with the anesthesia or . . . sent him into cardiac arrest." She also stated, "we were all searching for answers . . . because nobody had answers for me, and so therefore I kept questioning and questioning hoping to find an answer." In her quest for answers, Hurd made statements to Dr. Kelly regarding the possible cause of Respondent's failure to react to resuscitation efforts—that is, she made statements for the purpose of diagnosis.

¶ 29 This is true despite the fact that the statements were made after Respondent was in a vegetative state. Although treatment was not available at the time that the statements were made, the diagnostic process was still ongoing, as shown by Hurd's own state-

ments to Dr. Kelly. Respondent's condition was irreversible, but its cause was still a mystery, prompting Hurd to speak to Dr. Kelly. We conclude that Hurd's statements were made for the purpose of determining the nature, source, or cause of Respondent's medical condition, and therefore made for the purpose of diagnosis.

¶ 30 Hurd's statements also satisfy Rule 803(4)'s remaining requirements. The statement met the Rule's second requirement because it described Respondent's medical history. Drug use is part of a patient's medical history. *See Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 (10th Cir.2001) ("[D]rug use is an important indicator of a patient's physical condition.").

¶ 31 Hurd's statements also met the third requirement of Rule 803(4), which requires the statement to be "reasonably pertinent to diagnosis." The court of appeals reasoned that although such statements might be reasonably pertinent to treatment generally, they were not reasonably pertinent here because Respondent was already in a vegetative state and no treatment was possible. *Kelly*, 2011 WL 4908743 at *8, —— P.3d at ——. Again, we disagree. Statements regarding past drug use would be reasonably pertinent to determining the cause of—that is, to diagnose—a failure to respond to resuscitation efforts.

¶ 32 We therefore hold that the court of appeals erred in concluding that Hurd's statements could not fall within the language of Rule 803(4) because they were not made in the context of prospective treatment. Using the proper interpretation of Rule 803(4), we conclude that the statements fall within the rule because they were made for purposes of diagnosis, described Respondent's medical history, and were reasonably pertinent to diagnosis.[7] Ultimately, then, we hold that

---

6. The court of appeals noted that although there was some dispute in the trial court over the nature of Hurd's relationship to Respondent, her statement would not fall within Rule 803(4) "[e]ven if Hurd was sufficiently close to plaintiff." *Kelly*, 2011 WL 4908743 at *7, —— P.3d at ——. But the question is not whether a particular declarant had a sufficiently close relationship to the patient to make her statement reliable, however. Rather, as we note below, the question is

whether the declarant made the statement for purposes of medical diagnosis or treatment; if so, the statement is presumed reliable.

7. We note that throughout its analysis of Rule 803(4), the court of appeals suggested that Hurd's statements were inadmissible under *Clark v. People*, 103 Colo. 371, 86 P.2d 257 (1939), because they related to the determination of fault or responsibility, rather than prospective treat-

the district court did not abuse its discretion in admitting Hurd's statements under Rule 803(4). *See United States v. Norman T.*, 129 F.3d 1099, 1105 (10th Cir.1997) (reviewing a district court's application of Rule 803(4) under an abuse of discretion standard).

### B.

¶ 33 Citing a similar prospectivity rationale, the court of appeals concluded Hurd's statement was inadmissible under Rule 803(4) for the additional reason that it failed that court's two-part "reliability" test. *Kelly*, 2011 WL 4908743 at *9, —— P.3d at ——. We find that the court's application of its test fails for its mistaken emphasis on prospectivity, as described above. In addition, however, we reject the court's application of the two-part test to the extent that is inconsistent with *King* and the language of Rule 803(4).

¶ 34 Relying on *People v. Allee*, 77 P.3d 831, 834–35 (Colo.App.2003), the court of appeals articulated its two-part "reliability test" as follows: "In determining whether statements are admissible under CRE 803(4), courts apply a two-part test of reliability: first, the declarant's motive in making the statement must be consistent with the purpose of promoting treatment or diagnosis; and second, the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis." *Kelly*, 2011 WL 4908743 at *7, —— P.3d at —— (internal quotation marks omitted).

¶ 35 To the extent that the court of appeals' test simply restates two of the re-

quirements of Rule 803(4)—namely, that statements be made for purposes of medical diagnosis or treatment and be reasonably pertinent to diagnosis or treatment—we take no issue with it. What is problematic, however, is the court of appeals' application of the test.

■ ¶ 36 In applying the first prong, for example, the court of appeals raised the question of whether Hurd was "sufficiently close" to Respondent to make a reliable statement, but did not fully resolve the issue because Hurd had no "treatment motive" given the fact that Respondent was in a vegetative state at the time. *Id.* at *7, ——. The court of appeals' application of the first prong fails for its focus on prospectivity, as noted above. But it further fails to the extent that it suggests that there is a test of reliability that is separate from the "made for the purpose of medical diagnosis or treatment" language of the Rule.

¶ 37 In *King*, we addressed this precise issue. In that case, the court of appeals concluded that even though the statements at issue were made to an expert for the purpose of medical diagnosis, they lacked independent guarantees of trustworthiness and were therefore inadmissible. *King*, 785 P.2d at 600. In *King*, the court of appeals relied upon the two-part test articulated in *People v. Stiles*, 692 P.2d 1124, 1127–28 (Colo.App. 1984), *overruled in part by King*, 785 P.2d at 599, which established the two-part test upon which the court of appeals relied in this case.[8] We "expressly overruled" *Stiles* to

ment. *See e.g., Kelly*, 2011 WL 4908743 at *8, —— P.3d at —— (suggesting that there could be no reasonable reliance on the statement because Respondent was already in a vegetative state and "[t]he alleged malpractice had already occurred"); *id.* at *9, —— (the fact that physicians did no further testing to validate or refute Hurd's statements "further supports our conclusion that the after-the-fact information about past cocaine use was not material to plaintiff's treatment, but only could bear upon fault for plaintiff's condition"); and *id.* at *10–11, —— (discussing *Clark*). The court of appeals' concern with *Clark*, which held that "statements concerning the question of responsibility for an injury ... are inadmissible," 103 Colo. at 377, 86 P.2d at 259, is misplaced. First, *Clark* predates our adoption of the Colorado Rules of Evidence. Second, the Advisory Committee to the Federal

Rules of Evidence addressed this issue, noting that "a patient's statement that he was struck by an automobile would qualify [for admission under the Rule] but not his statement that the car was driven through a red light." Fed.R.Evid. 803(4) advisory committee's note. Here, we find that Hurd's statements were admissible under Rule 803(4) as statements made for the purpose of diagnosis; they therefore are not statements regarding liability that would fall outside the Rule.

8. The court of appeals in this case cited *Allee*, 77 P.3d at 834–35, for the test. *Allee* cited *People v. Galloway*, 726 P.2d 249, 252–53 (Colo.App. 1986). *Galloway* in turn relied upon *Stiles*, 692 P.2d at 1127–28 (citing *Iron Shell*, 633 F.2d at 83), *overruled in part by King*, 785 P.2d at 599.

the extent that the case could be read "as requiring a proponent of the hearsay statement to make some independent demonstration of the trustworthiness of the statement as a prerequisite of admissibility." *Id.* at 599 n. 3. Indeed, we noted that "[Rule] 803(4) is itself predicated on considerations of trustworthiness" and that if the statement meets the requirements of Rule 803(4), it qualifies for admission. *Id.* at 603.

■ ¶ 38 As applied in this case, Hurd's statements were made for the purpose of medical diagnosis, as noted above. No further inquiry into her motivations is required or permitted by the language of the Rule. Thus, for example, there is no separate inquiry into whether a declarant is sufficiently close to the patient to make a reliable statement, as the court of appeals appears to suggest. Rather, the question is whether the declarant made the statement for purposes of medical diagnosis or treatment, which was the case here. To the extent that the court of appeals required in this case, or in its case law more generally, an indicia of trustworthiness or reliability in addition to establishing that the statement was made for purposes of medical diagnosis or treatment, it is again overruled. *Id.* at 599 n. 3; *see also Vigil,* 127 P.3d at 927 (restating *King's* holding that it is not necessary for a proponent to demonstrate trustworthiness or reliability of a statement independent of showing that the statement fell within Rule 803(4)); *United States v. Joe,* 8 F.3d 1488, 1494 n. 5 (10th Cir.1993) (reinforcing that the only test for reliability in Rule 803(4) is whether the statement was made "for the purposes of medical diagnosis or treatment" and noting that "the rule itself has built-in guarantees that assure the trustworthiness of a statement made for purposes of medical diagnosis or treatment").

¶ 39 The court of appeals' application of the second prong of its test is similarly problematic. The second prong requires that "the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis." *Kelly,* 2011 WL 4908743 at *7, —— P.3d at ——. In this case,

the court of appeals erred in finding that Hurd's statements were not pertinent because treatment was no longer a possibility. *Id.* at *8, ——.

■ ¶ 40 But the court further erred by concluding that the statements were not reasonably pertinent because Dr. Kelly did not actually rely upon them. *Id.* By its language, Rule 803(4) suggests an objective inquiry—that is, whether the statements were of a kind "*reasonably* pertinent to diagnosis or treatment"—not a subjective one, as the court of appeals applied. Thus, contrary to the court of appeals' inquiry, the question is not whether Dr. Kelly actually relied upon Hurd's statements, but whether the statements were reasonably pertinent to finding a cause of Respondent's poor response to resuscitation efforts. Here, they were. *See Phillips,* 244 F.3d at 800.

■ ¶ 41 It is true that in *King,* we referenced a testifying expert's reliance upon hearsay statements. In that case, we stated that the "concern over the possibility of exaggerated or false testimony coming into evidence under the aegis of Rule 803(4) is effectively allayed by the [R]ule itself," given that the Rule "requires as a foundation for admission that the proponent establish that statements made to a nontreating psychiatrist be reasonably pertinent to diagnosis and be relied upon by the psychiatrist in arriving at an expert opinion on the mental condition in issue." *King,* 785 P.2d at 602; *see also Vigil,* 127 P.3d at 927 (restating *King's* formulation). But we went on to explain that the requirement that an expert reasonably rely upon the statements stems from Colorado Rule of Evidence 703, which states that an expert may base her opinion on inadmissible facts or data "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions." *King,* 785 P.2d at 602 n. 6; *see also Gong v. Hirsch,* 913 F.2d 1269, 1274 (7th Cir.1990) (stating that "reasonably pertinent to" language is equivalent to "whether an expert in the field would be justified in relying upon this statement in rendering his opinion" under Rule 703) (cit-

The court of appeals has applied the two-part test in other cases as well, including *People v. Jaramillo,* 183 P.3d 665, 669 (Colo.App.2008), *cert.* denied, 2008 WL 2174055 (Colo.2008); and *People v. Tyme,* 2013 COA 59, ¶¶ 9–10, 315 P.3d 1270, 1272 (Colo.App.2013).

ing 4 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 803(4)[1], at 803–146 to 803–147 (1988)). In other words, in the testifying expert context, the expert may rely on the declarant's statements in forming her expert opinion only if it would be reasonable to do so under Rule 703. In such a case, actual reliance is an integral part of forming an expert opinion.

¶ 42 Here, in fact, six healthcare professionals hired as expert witnesses actually relied on Hurd's statements (and other evidence of Respondent's cocaine use) to form their opinions regarding the effects that cocaine use may have had on Respondent's health and efforts to resuscitate him. These experts testified that cocaine use is associated with cardiac arrest; that cocaine has a toxic effect on the heart; that cocaine is addictive and may cause long-term heart damage; that cardiac arrhythmias and death of heart muscle can be attributed to cocaine use; that residual abnormalities after ceasing cocaine use might make a person resistant to resuscitation efforts; and that cocaine decreases the heart's response to stimulants administered to resuscitate a patient. In sum, these experts actually relied upon Hurd's statements to Dr. Kelly to form their expert opinions, and—given our conclusion that Hurd's statements were reasonably pertinent to diagnosis or treatment—they did so reasonably under Rule 703.

¶ 43 By contrast, Dr. Kelly is not a testifying expert who has formed an expert opinion in reliance upon Hurd's statements. Rather, he is testifying as to what he heard. As noted above, under Rule 803(4), actual reliance upon the statements is not required. Indeed, a statement may be made to someone—to a family member, for example—who has no involvement in the provision of medical services, thus precluding actual reliance. *See* Fed.R.Evid. 803(4) advisory committee's note (statements may be made to non-physicians, including family members). But that statement is admissible under the Rule as long as it is made for purposes of medical diagnosis or treatment, and is reasonably

pertinent to diagnosis or treatment. Because such requirements were shown here, we conclude that Hurd's statements to Dr. Kelly were admissible under Rule 803(4).[9]

## III.

¶ 44 Given its determination that Hurd's statements were not admissible under Rule 803(4), it was unnecessary for the court of appeals to determine that they would be inadmissible under Rule 403 even if they fell within the ambit of Rule 803(4). *Kelly,* 2011 WL 4908743 at *11–12, —— P.3d at ——. However, because we reverse the court of appeals' determination as to the scope of Rule 803(4), and conclude that Hurd's statements fall within the Rule, we are obliged to consider whether the trial court abused its discretion in admitting the statements under Rule 403. *See King,* 785 P.2d at 603 (noting that even if hearsay evidence qualifies as admissible under 803(4), evidence may still be excluded under Rule 403). In doing so, we address the court of appeals' rationale for finding an abuse of discretion.

¶ 45 Rule 403 establishes the principle that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Thus, we have held that "[t]he liberal approach in admitting evidence is tempered by Rule 403 which gives a court discretion to exclude ... testimony where its probative value would be substantially outweighed by unfair prejudice." *People v. Martinez,* 74 P.3d 316, 321 (Colo.2003). Rule 403 strongly favors admissibility of relevant evidence, and an appellate court "must afford the evidence the maximum probative value attributable by a reasonable fact finder and the minimum unfair prejudice to be reasonably expected" from the evidence. *People v. Gibbens,* 905 P.2d 604, 607 (Colo.1995). Under Rule 403, "trial courts are given broad discretion in balancing the probative value of the evidence against the danger of unfair

**9.** Because we find Hurd's statements to be admissible under Rule 803(4), we need not consider the district court's alternative rationale for admission under the residual hearsay exception (or the court of appeals' rejection of that rationale).

prejudice." *Id.* The trial court's decision under Rule 403 will not be disturbed on review absent an abuse of discretion, defined as a decision that is manifestly arbitrary, unreasonable, or unfair. *Id.*

¶ 46 In this case, we cannot conclude that the trial court's decision to admit Hurd's statements under Rule 403 was manifestly arbitrary, unreasonable, or unfair. With regard to probative value, the trial court stated that Hurd's statements were "really the key to this case ... the probative value of those statements is imperative to [Petitioners'] presentation of the case." As for the danger of unfair prejudice, the trial court stated that "[u]nder [Rule] 403, [the evidence of Hurd's statements] is intensely probative in the case, and ... is also intensely prejudicial to [Respondent] in this case, on balance I think that it is appropriate to permit that information in." The trial court also stated that any issues of prejudice would be "suitable for cross-examination and also for ultimate argument." In sum, the trial court concluded that Hurd's statements were "intensely prejudicial" because they were "intensely probative," and that on balance the statements should be admitted.

■■ ¶ 47 The court of appeals focused on the trial court's conclusion that the statements would be "intensely prejudicial," suggesting that the statements should be excluded because even the trial court thought they were prejudicial. *Kelly*, 2011 WL 4908743 at *11, —— P.3d at ——. However, contrary to the court of appeals' implication, the trial court did not find the statements to be *unfairly* prejudicial. "Unfair prejudice" as the phrase is used in Rule 403 "does not mean prejudice that results from the legitimate probative force of the evidence." *Gibbens*, 905 P.2d at 608. Indeed, we have observed that "[a]ll effective evidence is prejudicial in the sense of being damaging or detrimental to the party against whom it is offered." *People v. Dist. Court*, 785 P.2d 141, 147 (Colo.1990). Instead, "unfair prejudice" means "an undue tendency on the part of admissible evidence to suggest a decision made on an improper basis." *Gibbens*, 905 P.2d at 608 (citation and internal quotation marks omitted). Thus, even where the evidence might "reflect poorly" on the party about whom it concerns, it may still be admissible if the "trial court could have reasonably concluded that the potential prejudice was not unfair." *Id.* Here, the trial court could have reasonably concluded that members of the jury would not base their decision on their views of cocaine use, but rather on how cocaine use might have caused Respondent's poor reaction to resuscitation efforts— the central issue of the case. *See Ballou v. Henri Studios, Inc.*, 656 F.2d 1147, 1155 (5th Cir.1981) (holding that evidence of driver's intoxication was admissible in a negligence action arising out of a car accident, and that "unfair prejudice" is not equal to evidence adverse to the other party—the prejudice must have "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one") (internal citations omitted).

■ ¶ 48 Further, Rule 403 not only requires that there be a danger of unfair prejudice, such danger must "substantially outweig[h]" the probative value of the evidence. *Dist. Court*, 785 P.2d at 146. As we have observed, the requirement that the danger substantially outweigh the probative value of the evidence "is meant to make clear that the need for exclusion must be clear since exclusion is a drastic remedy and less restrictive measures, such as cautionary instructions to the jury, may suffice to reduce the danger of prejudice to an acceptable level." *Id.* at 146–47 (citing 1 J. Wigmore & P. Tillers, Wigmore on Evidence § 10A, at 680 (1983)). In this instance, by concluding that issues of prejudice could be dealt with through cross-examination and argument, the trial court determined that such "less restrictive measures" were available here. As with unfair prejudice discussed above, the trial court could have reasonably concluded that cross-examination and argument would address potential prejudice by focusing the jury's attention to causation.

¶ 49 Ultimately, we cannot conclude that the trial court abused its discretion in determining that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. We therefore do not disturb its determination, and

reverse the court of appeals' contrary conclusion.

## IV.

¶ 50 Respondent also argued in his motions in limine that any additional testimony regarding cocaine use—including testimony from family members about Respondent's cocaine use and expert testimony about the health effects of cocaine use—should be excluded. Importantly, however, his argument to preclude this testimony was based on the success of his argument to exclude Hurd's statements to Dr. Kelly. In other words, Respondent argued that because Hurd's statements were inadmissible, any other testimony regarding cocaine use would be irrelevant. Based on Respondent's argument, the trial court made no individual determinations regarding the relevance of any particular testimony, but rather denied the motions in limine in their totality based on its conclusion that Hurd's statements were admissible under Rule 803(4).

¶ 51 Similarly, the court of appeals treated the admissibility of other cocaine evidence as dependent upon its conclusion regarding Rule 803(4). When it determined that the statements did not fall within Rule 803(4) and that the trial court erred in holding to the contrary (and further, that even if the statements were admissible under Rule 803(4), they should have been excluded under Rule 403), the court of appeals excluded the remaining testimony regarding cocaine use as irrelevant. *Kelly,* 2011 WL 4908743 at *5–6, —— P.3d at —— (holding that all "evidence about [Respondent's] alleged cocaine use," including Hurd's statements, his family's testimony, and "various medical witness' opinions relying on the foregoing evidence" was inadmissible); *id.* at *12, —— (framing question as whether "the cocaine use evidence" fell within Rule 803(4) or the residual hearsay exception, and then whether such evidence should have been excluded under Rule 403). The parties in their presentations to us largely hinge the admissibility of other cocaine testimony upon the admissibility of Hurd's statements.

¶ 52 Given the procedural posture of the case, we—like the trial court and court of appeals—do not perform an individualized analysis of the admissibility of the additional testimony regarding cocaine use. Instead, we perceive no abuse of discretion by the trial court in allowing it based on the admissibility of Hurd's statements to Dr. Kelly under Rule 803(4).

## V.

¶ 53 For the reasons stated above, we reverse the court of appeals' decision holding as inadmissible Hurd's statements to Dr. Kelly, and other lay and expert testimony related to Respondent's cocaine use. We remand the case to the trial court to enter a judgment in Petitioners' favor.

CHIEF JUSTICE RICE concurs in the judgment, and JUSTICE HOBBS and JUSTICE COATS join in the concurrence of the judgment.

CHIEF JUSTICE RICE, concurring in the judgment.

¶ 54 I agree with the majority's holding that Hurd's hearsay statements to Dr. Kelly are admissible under Rule 803(4) as statements made for purposes of *diagnosis*. *See* maj. op. ¶ 32. I write separately, however, because I disagree with the majority's conclusion that Hurd's statements satisfied Rule 803(4)'s "reasonably pertinent" requirement simply because statements regarding past drug use are objectively pertinent to diagnosing a person's failure to respond to resuscitation efforts. *See id.* at ¶¶ 31, 40. Concluding that "actual reliance upon [Hurd's] statements is not required" to show that her statements are reasonably pertinent to Respondent's diagnosis, *see id.* at ¶ 43, the majority completely ignores the fundamental differences between statements made for purposes of treatment and statements made for purposes of diagnosis.

¶ 55 Unlike the majority, I believe that statements made for purposes of diagnosis can only satisfy Rule 803(4)'s "reasonably pertinent" requirement if the statements are both objectively and subjectively pertinent to diagnosis. Here, Hurd's statements to Dr. Kelly regarding Respondent's past cocaine use satisfy this requirement because they are

(1) objectively pertinent to diagnosing a person's failure to respond to resuscitation efforts (i.e., an expert in the field would be justified in relying on such statements in forming an expert opinion), and (2) subjectively pertinent to the opinions rendered by six expert witnesses who testified regarding the possible effects that cocaine use had on Respondent's health and efforts to resuscitate him (i.e., non-treating physicians hired for litigation actually relied on Hurd's statements). Accordingly, I concur in the judgment only.[1] Because my analytical divergence from the majority opinion is animated by Rule 803(4)'s departure from the common law, I start by outlining the rule's evolution. I then describe the two-step analysis that I would use to determine whether hearsay statements made for purposes of diagnosis satisfy Rule 803(4)'s "reasonably pertinent" requirement.

## I. Evolution of Rule 803(4)

¶ 56 Hearsay is a statement other than one made by the declarant while testifying at trial that is offered into evidence to prove the truth of the matter asserted. CRE 801(c). Because hearsay statements are "presumptively unreliable," *Blecha v. People*, 962 P.2d 931, 937 (Colo.1998), parties are generally prohibited from introducing hearsay statements into evidence, *see* CRE 802. There are, however, several exceptions to this general rule. The exception at issue in this case, Rule 803(4), permits hearsay statements "for purposes of medical diagnosis or treatment." Under Rule 803(4), hearsay statements are admissible if the statements: (1) are made for the purposes of medical diagnosis or treatment; (2) describe medical history, past or present symptoms, pain, sensations, or the cause or external source thereof; and (3) are *reasonably pertinent* to diagnosis or treatment.

¶ 57 Like all exceptions to the general rule prohibiting hearsay, Rule 803(4) reflects the "special trustworthiness of and necessity for admitting the general category of hearsay embraced in the exception." Paul F. Rothstein, Federal Rules of Evidence Rule 803 (3d ed.), *available on* Westlaw (updated Dec. 2013) [hereinafter Rothstein].[2] We have previously explained that statements made to physicians for purposes of medical *treatment* are "presumptively reliable because of a patient's belief that the effectiveness of the treatment he receives may depend largely upon the accuracy of the information he provides the physician." *W.C.L. v. People*, 685 P.2d 176, 181 (Colo.1984) (internal quotation marks omitted), *superseded on other grounds by statute*, § 13–90–106(1)(b)(II), C.R.S. (1989); *see also* Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 8:75 (4th ed.), *available on* Westlaw (updated May 2014) [hereinafter Mueller] (explaining that a patient has a powerful incentive to speak candidly and carefully because "the patient knows that his description helps determine treatment").

¶ 58 Statements made for purposes of medical *diagnosis* only, however, do not offer the same assurances of candor. Because individuals seeking a diagnosis are likely to be preparing a doctor for litigation, they have more of a temptation to misrepresent the nature and extent of their injuries or symptoms than individuals who are seeking only treatment or both treatment and diagnosis. *See* Mueller, § 8:75. Thus, where statements are made only for purposes of diagnosis, we have identified an alternative basis for reliability. Instead of focusing on the patient's incentive to tell the truth by virtue of his desire to receive effective medical services, we have focused on the physician's ability to detect inaccurate or false information by virtue of his specialized training and experience, which together safeguard

---

1. I do not separately address the Rule 403 issue because I agree with the majority's holding that the trial court's decision to admit Hurd's statements under Rule 403 was not manifestly arbitrary, unreasonable, or unfair. *See* maj. op. ¶ 46. Further, I decline to analyze the admissibility of Hurd's statements based on Rule 807 because such an analysis would go beyond the scope of

the majority opinion, which declined to reach the Rule 807 issue. *See id.* at ¶ 43 n. 9.

2. Because CRE 803(4) is virtually identical to Fed.R.Evid. 803(4), this Court has previously interpreted it in light of the text and purpose of the federal rule. *See King v. People*, 785 P.2d 596, 601 (Colo.1990).

the reliability of his medical diagnosis. *See King v. People,* 785 P.2d 596, 602 (Colo.1990) (explaining that the defendant's hearsay statements to a psychiatrist hired for trial were admissible under Rule 803(4) because "physicians, by virtue of their training and experience, . . . are not prone to rely upon inaccurate or false data in making a diagnosis").

¶ 59 Importantly, this alternative rationale reflects Rule 803(4)'s departure from the common law tradition. At common law, statements made to a testifying expert for purposes of medical diagnosis were not admissible as substantive evidence. *See* Fed. R.Evid. 803 advisory committee's note on para. 4 ("Conventional doctrine has excluded from the hearsay exception, as not within its guarantee of truthfulness, statements to a physician consulted only for the purpose of enabling him to testify."). Thus, prior to the adoption of the Colorado Rules of Evidence, statements to a testifying expert were only admissible "for the limited purpose of serving as factual support for the [expert's] opinion." *King,* 785 P.2d at 601. Such statements were "not viewed as evidence of the truth of the matters asserted, and hence were not hearsay, but rather were considered as merely explanatory of the [expert's] opinion, enabling the jury to weigh [the opinion] in light of its basis." *Id.* (internal quotation marks omitted).

¶ 60 Recognizing that it is unrealistic to expect a jury to distinguish between statements offered only as an explanation of the basis for the expert's opinion and statements offered for their truth, in *King* this Court held that Rule 803(4) abolished the common law distinction between doctors consulted for treatment and doctors consulted for diagnosis. *Id.* at 601–02. Thus, we concluded that hearsay statements made to a non-treating physician "who examines a party for the purpose of diagnosis only" may be admissible under Rule 803(4) even though that physician was "consulted only in order to testify as a

witness." *Id.* (internal quotation marks omitted). This expansion of Rule 803(4) to include non-treating physicians hired for litigation "is consistent with the provision of Rule 703 that the facts on which expert testimony is based need not be admissible in evidence if of a kind ordinarily relied upon by experts in the field." *See* Fed.R.Evid. 803 advisory committee's note on para. 4; *see also King,* 785 P.2d at 602 (explaining that a "statement reliable enough to serve as a basis for psychiatric diagnosis should also be considered reliable enough to escape the hearsay proscription"); Mueller, § 8:75 (noting that the rationale underlying the expansion of Rule 803(4) "suggests that statements to a doctor hired only to diagnose and aid in litigation should be admitted only if the doctor testifies and gives his opinion").

## II. Two–Step Analysis

¶ 61 As the evolution of the rule makes clear, there are two distinct avenues for admitting hearsay statements under Rule 803(4). One avenue is available for statements that are made for purposes of *treatment,* and a second, more limited, avenue is available for statements that are made for purposes of *diagnosis* only. Where, as here, the theory for admissibility is based on the latter avenue, I believe that *King* requires courts to employ a two-step analysis—considering both objective and subjective pertinence—when determining whether particular hearsay statements satisfy Rule 803(4)'s "reasonably pertinent" requirement.[3]

¶ 62 In *King,* this Court held that hearsay statements made to non-treating physicians who are consulted only to testify as expert witnesses are sufficiently reliable to qualify for admission under Rule 803(4). 785 P.2d at 602. Emphasizing that the rule itself allays concerns regarding the possibility of exaggerated or false testimony, we explained that Rule 803(4) requires "as a foundation for admission that the proponent establish that

---

**3.** Although the majority explicitly acknowledges that actual reliance on hearsay statements is required in the expert witness context, *see* maj. op. ¶ 41, the majority nonetheless concludes that the pertinence inquiry under Rule 803(4) is purely objective, *see id.* at ¶ 40. This conclusion wholly ignores the practical concerns that animated the rule's departure from the common law and the fundamental differences between statements made for purposes of treatment and statements made for purposes of diagnosis.

[the hearsay] statements made to a nontreating [physician] be reasonably pertinent to diagnosis *and* be relied upon by the [physician] in arriving at an expert opinion." *Id.* (emphasis added).[4] Put another way, we established that statements made to a nontreating physician hired for litigation are admissible under Rule 803(4) if the statements are both objectively *and* subjectively pertinent to diagnosis.

¶ 63 Consistent with our holding in *King,* I would require courts to employ a two-step analysis when determining whether particular hearsay statements are reasonably pertinent to diagnosis under Rule 803(4). Under this two-step analysis, a court should first determine whether the relevant hearsay statements are objectively pertinent to achieving a diagnosis. In other words, similar to a Rule 703 analysis, the court should determine whether an expert in the germane field would be justified in relying upon the statements in formulating an expert opinion.

¶ 64 If the court determines that the relevant statements are objectively pertinent, it should then determine whether the statements are also subjectively pertinent to the diagnosis rendered. In other words, the court should determine whether a non-treating physician hired for litigation actually relied on the hearsay statements in formulating his expert opinion. Importantly, an expert witness who was *not* the recipient of the relevant hearsay statements can demonstrate actual reliance. Thus, contrary to the court of appeals, which concluded that Hurd's statements were not reasonably pertinent to Respondent's diagnosis because *Dr. Kelly* did not actually rely upon them, I would conclude that Hurd's statements were reasonably pertinent to Respondent's diagnosis because *six expert witnesses* did actually rely upon her

statements in formulating their opinions. *See* maj. op. ¶ 42.[5]

¶ 65 Applying this two-step analysis to the present case, Hurd's statements clearly satisfy Rule 803(4)'s "reasonably pertinent" requirement. First, her statements are objectively pertinent to diagnosing Respondent's failure to respond to resuscitation efforts because cocaine use can undermine heart health. Accordingly, a cardiologist or toxicologist would be justified in relying on information about cocaine use in rendering an opinion regarding a patient's failure to respond to resuscitation efforts after cardiac arrest. Second, Hurd's statements are subjectively pertinent to the opinions rendered by six expert witnesses whose testimony regarding the possible effects that cocaine use had on efforts to resuscitate Respondent flowed directly from Hurd's suggestion that Respondent had previously used cocaine.

### III. Conclusion

¶ 66 Contrary to the majority, I believe that statements made for purposes of medical diagnosis can only satisfy Rule 803(4)'s "reasonably pertinent" requirement if the statements are *both* objectively and subjectively pertinent to diagnosis. Accordingly, I concur in the judgment only.

I am authorized to state that JUSTICE HOBBS and JUSTICE COATS join in this concurrence of the judgment.

4. In *People v. Vigil,* 127 P.3d 916, 927 (Colo. 2006), this Court reaffirmed *King's* articulation of Rule 803(4)'s foundation requirements in the diagnosis context.

5. Although Hurd's hearsay statements were introduced into evidence by Dr. Kelly, who was not an expert hired for purposes of litigation, her statements are nonetheless admissible given the unique existence of the other experts in this case who relied on Dr. Kelly's testimony regarding

Hurd's statements. Such reliance is appropriate given the possibility of admitting multiple levels of hearsay under this particular hearsay exception. *See* Mueller, § 8:75 (noting that Rule 803(4) is broad enough to pave the way to admit some statements that are passed along to a testifying physician, even though the physician's testimony would embrace double or multiple hearsay).